F I L E D
United States Court of Appeals
Tenth Circuit

APR 11 2001

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

BILLY KEITH McGREGOR,

      Petitioner - Appellant,

v.

GARY GIBSON, Warden,
Oklahoma State Penitentiary  ,

      Respondent - Appellee.

No. 99-7038

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. CIV-97-120-B)**

Vicki Ruth Adams Werneke, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for the Petitioner-Appellant.

William L. Humes, Assistant Attorney General (W.A. Drew Edmondson, Attorney General of Oklahoma, with him on the brief), State of Oklahoma, Oklahoma City, Oklahoma, for Respondent-Appellee.

Before **TACHA**, Chief Judge, **SEYMOUR**, **BALDOCK**, **BRORBY**, **EBEL**, **KELLY**, **BRISCOE**, **LUCERO** and **MURPHY**, Circuit Judges.

**LUCERO**, Circuit Judge.

Billy Keith McGregor was convicted under Oklahoma law of first-degree murder and sentenced to death. A panel of this Court affirmed the district court's denial of habeas relief to McGregor. We subsequently granted rehearing en banc to review our standard for assessing procedural competency claims. This standard is of particular importance in the aftermath of the Supreme Court's unanimous decision in Cooper v. Oklahoma, 517 U.S. 348 (1996), holding unconstitutional the Oklahoma law requiring criminal defendants to prove incompetency to stand trial by clear and convincing evidence.

## I. Background

McGregor was convicted by an Oklahoma jury of murdering Virgie Plumb, the owner of a home in which he was a boarder. The victim disappeared on May 22, 1983, and was last seen as a passenger in her own car driven by McGregor.

The day after Plumb's disappearance, McGregor attempted to sell an antique clock and a car, both of which belonged to the victim. The following day he cashed a check allegedly written to him by the victim. Later that day, a second similar check was rejected for insufficient funds, and McGregor went to the police to report the "bad check."

In the following days, McGregor related several different stories to people about his interactions with the victim. He told some that he had taken her to her brother's home and others that he had taken her to a convenience store and when

he came to pick her up she was gone. After interviews with the police, McGregor confessed to killing Plumb and leaving her body in a wooded rural area.

McGregor was convicted by a jury of first-degree murder and sentenced to death. Pursuant to the Supreme Court's decision in Ake v. Oklahoma, 470 U.S. 68 (1985), McGregor's conviction and death sentence were reversed by the Oklahoma Court of Criminal Appeals. McGregor v. Oklahoma, 754 P.2d 1216, 1218 (Okla. Crim. App. 1988) (holding that McGregor was entitled to a court-appointed psychiatrist because a "[s]ufficient showing [was] . . . made to reflect that appellant's sanity at the time of the offense [might] be a significant factor at trial").

In 1989, McGregor was tried again for the murder of Plumb and raised the defense of not guilty by reason of insanity. The jury rejected his defense and, for the second time, convicted him of first-degree murder. At sentencing, the jury found aggravating circumstances and sentenced McGregor to death. On direct appeal, the Oklahoma Court of Criminal Appeals affirmed McGregor's conviction and death sentence. McGregor v. Oklahoma, 885 P.2d 1366 (Okla. Crim. App. 1994).

Before McGregor's second trial, a competency proceeding was held and a jury found McGregor competent to stand trial. At that proceeding, the jury was instructed that McGregor had to prove incompetency by clear and convincing

evidence. [1] The Supreme Court subsequently held the clear and convincing evidence standard "incompatible with the dictates of due process" because it allowed a state to "put to trial a defendant who [was] more likely than not incompetent." Cooper, 517 U.S. at 369. Accordingly, McGregor brought state post-conviction proceedings to challenge, inter alia, the application to him of the unconstitutional burden of proof. McGregor v. Oklahoma, 935 P.2d 332 (Okla. Crim. App. 1997). His Cooper challenge was denied as procedurally barred, see id. at 334, and McGregor sought habeas relief in federal court. The district court also held that McGregor's procedural competency claim was barred, McGregor v. Ward, No. CIV-97-120-B, at 12–16 (E.D. Okla. Feb. 5, 1999) (unpublished order), but assessed the merits and found McGregor did not meet his burden of raising a bona fide doubt as to his competency during his criminal trial, id. at 16.

---

[1] The State, in its closing arguments, read the instruction on the clear and convincing evidence burden of proof:

> When I say clear and convincing evidence, I mean that you must be persuaded, considering all the evidence in the case, that the Petitioner is incompetent as defined by these Instructions and that the conclusion is unmistakable and free from serious or substantial doubt as to its correctness.

(Comp. Trial Tr. at 232.) The State then opined that "[t]he law is correct in assuming him competent and placing the burden on him to present the evidence . . . ." (Id.)

On appeal, a panel of this Court affirmed the district court's denial of habeas relief under 28 U.S.C. § 2254. McGregor v. Gibson, 219 F.3d 1245 (10th Cir. 2000). The panel was divided; Judge Murphy filed a dissenting opinion expressing his disagreement with the "majority's resolution of McGregor's procedural competency claim." Id. at 1257. We granted en banc review to consider this important issue: When may a defendant found competent to stand trial under an unconstitutional "clear and convincing evidence" burden of proof and then convicted succeed in habeas on a procedural competency claim?

## II. Standard of Review

Because McGregor filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, the provisions of that Act govern this appeal. See Williams v. Taylor, 529 U.S. 362, 402 (2000). Inasmuch as the state court did not hear the merits of petitioner's claim and the federal district court made its own determination in the first instance, we review the district court's conclusions of law de novo and its factual findings for clear error. See LaFevers v. Gibson, 182 F.3d 705, 711 (10th Cir. 1999). "If the district court's factual findings are based only on a review of the state court record, we conduct an independent review." Walker v. Gibson, 228 F.3d 1217, 1225 (10th Cir. 2000) (citation omitted).

### III. Competency to Stand Trial

### A. Background

It is well-settled that the "criminal trial of an incompetent defendant violates due process." Medina v. California, 505 U.S. 437, 453 (1992). This "prohibition is fundamental to an adversary system of justice." Drope v. Missouri, 420 U.S. 162, 172 (1975). The rule, rooted in the common law, is likely a "by-product of the ban against trials in absentia; the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to defend himself." Id. at 171 (quoting Foote, A Comment on Pre-Trial Commitment of Criminal Defendants, 108 U. Pa. L. Rev. 832, 834 (1960)). [2]

The test for determining competency to stand trial is well-established. The trier of fact must consider "whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). "That defendant can recite the charges against [him], list witnesses, and use legal terminology are

_____

[2] One criminologist has stated that incompetent persons "are not really present at trial; they may not be able properly to play the role of an accused person, to recall relevant events, to produce evidence and witnesses, to testify effectively on their own behalf, to help confront hostile witnesses, and to project to the trier of facts a sense of their innocence." Medina, 505 U.S. 437, 457–58 (1992) (Blackmun, J., dissenting) (quoting N. Morris, Madness and the Criminal Law 37 (1982)).

insufficient" to demonstrate that he had a rational, as well as factual, understanding of the proceedings. United States v. Williams, 113 F.3d 1155, 1159 (10th Cir. 1997).

"[C]ompetency claims can raise issues of both substantive and procedural due process." Walker v. Att'y Gen., 167 F.3d 1339, 1343 (10th Cir. 1999). A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing, while a substantive competency claim is founded on the allegation that an individual was tried and convicted while, in fact, incompetent. Id. at 1343–44. Accordingly, an individual raising a procedural competency claim is held to a lower burden of proof than one raising a substantive competency claim. See id. at 1344.

At issue in this appeal is McGregor's procedural competency claim rooted in his Fourteenth Amendment right to due process of law. Because the conviction of an accused person while legally incompetent violates due process, states must provide adequate procedures to protect accused individuals. See Pate v. Robinson, 383 U.S. 375, 378 (1966). The burden of providing these procedures persists throughout trial; thus, "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Drope, 420 U.S. at 181.

- 7 -

## B. Procedural Incompetency Claims After <u>Cooper</u>

McGregor's claim is one of many procedural incompetency claims this Court has reviewed in the wake of the Supreme Court's decision in <u>Cooper</u>. <u>See, e.g.</u>, <u>Walker v. Gibson</u>, 228 F.3d at 1226–29; <u>Valdez v. Ward</u>, 219 F.3d 1222, 1239–41 (10th Cir. 2000); <u>Van Woudenberg ex rel. Foor v. Gibson</u>, 211 F.3d 560, 567–68 (10th Cir. 2000); <u>Clayton v. Gibson</u>, 199 F.3d 1162, 1168–72 (10th Cir. 1999); <u>Barnett v. Hargett</u>, 174 F.3d 1128, 1133–36 (10th Cir. 1999); <u>Rogers v. Gibson</u>, 173 F.3d 1278, 1289–91 (10th Cir. 1999); <u>Walker v. Att'y Gen.</u>, 167 F.3d at 1342–47. We have held repeatedly that when a criminal defendant's competency was determined under an unconstitutional burden of proof, the prior competency determination merits no presumption of correctness. <u>See, e.g.</u>, <u>Walker v. Gibson</u>, 228 F.3d at 1227; <u>Van Woudenberg</u>, 211 F.3d at 567 n.5; <u>Clayton</u>, 199 F.3d at 1171; <u>Barnett</u>, 174 F.3d at 1135; <u>Walker v. Att'y Gen.</u>, 167 F.3d at 1345. Under such circumstances, this Court will review the trial as if no competency hearing was held at all. <u>Van Woudenberg</u>, 211 F.3d at 567 n.5 ("Because the state trial court held [petitioner] to an unconstitutional standard for proving incompetency, its decision is not entitled to a presumption of correctness and it is as if no competency hearing was held at all." (citations omitted)); <u>see also</u> <u>Barnett</u>, 174 F.3d at 1135; <u>Walker v. Att'y Gen.</u>, 167 F.3d at 1345.

Although it is clear that to prevail on a procedural due process competency claim a petitioner must raise a bona fide doubt regarding his competency to stand trial at the time of conviction, [3] the scope of that standard is less clear.  We have variously stated the bona fide doubt standard.  In some cases we have enunciated, tersely, that one can prevail on a procedural due process claim if he "establish[es] a bona fide doubt as to his competency at trial."  Barnett, 174 F.3d at 1135;  see also Wallace v. Ward, 191 F.3d 1235, 1242 (10th Cir. 1999).  In others we have required petitioners to show that the "trial judge ignored facts raising a 'bona fide doubt' regarding the petitioner's competence to stand trial."  Van Woudenberg, 211 F.3d at 567;  see also Rogers, 173 F.3d at 1290.  Yet in others we have stressed that a petitioner must show "the trial court ignored evidence, which viewed objectively, raised a bona fide doubt regarding [petitioner's] competency to stand trial."  Valdez, 219 F.3d at 1240;  see also Walker v. Gibson, 228 F.3d at

---

[3] See, e.g., Walker v. Gibson, 228 F.3d at 1227; Valdez, 219 F.3d at 1240; Van Woudenberg, 211 F.3d at 567; Clayton, 199 F.3d at 1171; Wallace v. Ward, 191 F.3d 1235, 1242 (10th Cir. 1999); Barnett, 174 F.3d at 1135; Rogers, 173 F.3d at 1290; Walker v. Att'y Gen., 167 F.3d at 1345; United States v. Williams, 113 F.3d at 1160; cf. Drope, 420 U.S. at 180 (reversing the trial court on the basis that the evidence presented by petitioner "created a sufficient doubt of his competence to stand trial to require further inquiry on the question"); Nguyen v. Reynolds, 131 F.3d 1340, 1346 (10th Cir. 1997) (requiring petitioner to make a "showing by clear and convincing evidence to raise threshold doubt about his competency" (internal quotation omitted)); United States v. Crews, 781 F.2d 826, 833 (10th Cir. 1986) ("To raise a substantial question requiring a competency hearing there must be some evidence to create doubt on the issue.").

1227; Clayton , 199 F.3d at 1171; Walker v. Att'y Gen. , 167 F.3d at 1345. Addressing procedural competency claims not induced by Cooper errors—i.e., claims based on the allegation that the trial court should have held a competency hearing but did not—we have stated that "we must determine whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." United States v. Crews , 781 F.2d 826, 833 (10th Cir. 1986) (internal quotation omitted); see also United States v. Williams , 113 F.3d at 1160; cf. Nguyen v. Reynolds , 131 F.3d 1340, 1346 (10th Cir. 1997) ("In order . . . to raise such doubt, [petitioner] must present facts sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt concerning his mental capacity" (internal quotation omitted)).

Today we are faced with the task of enunciating a single meaningful standard for assessing procedural competency claims in cases in which the trial court attempted—but failed—to protect an accused's due process rights by assessing his competency to stand trial under an unconstitutional burden of proof. In so doing, we must be careful not to collapse the distinction between procedural

and substantive due process by raising the level of proof required for procedural competency claims to that of substantive competency claims. [4]

Accordingly, we hold that to prevail on a procedural competency claim after a trial in which a petitioner was found competent under an unconstitutional burden of proof, the petitioner must establish that a reasonable judge should have had a bona fide doubt as to his competence at the time of trial. We view the evidence in the record objectively, from the standpoint of a reasonable judge presiding over petitioner's case at the time of trial. A petitioner establishes a bona fide doubt if he shows that a reasonable judge should have doubted whether petitioner had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and whether petitioner had "a rational as well as factual understanding of the proceedings against him." Dusky, 362 U.S. at 402. We stress that the due process requirement is continuing; a defendant must be competent throughout the entire trial. See Drope, 420 U.S. at 171–72, 181.

To prevail on a procedural competency claim petitioner need not establish facts sufficient to show he was actually incompetent or to show he was

---

[4] We reject as unsupported respondent's argument that the "only true difference between a procedural and substantive competency claim is that the procedural claim may be waived and there is no 'rebuttable presumption' of incompetence with a substantive claim." (Appellee's Supp. Br. at 4.)

incompetent by a preponderance of the evidence.  However, the mere fact that the

trial court granted a competency hearing will not suffice to demonstrate a bona

fide doubt.  Although we treat the trial as if no competency hearing was held,   see

Van Woudenberg , 211 F.3d at 567 n.5, we consider the record of, and the

evidence presented during, the competency hearing.   [5]

> We realize that

> [t]here are . . . no fixed or immutable signs which invariably indicate
> the need for further inquiry to determine fitness to proceed; the
> question is often a difficult one in which a wide range of
> manifestations and subtle nuances are implicated.  That they are
> difficult to evaluate is suggested by the varying opinions trained
> psychiatrists can entertain on the same facts.

Drope , 420 U.S. at 180.  That said, we look to longstanding precedent for

guidance regarding the factors to be considered in assessing a petitioner's

procedural competency claim.  "[E]vidence of . . . irrational behavior, . . .

demeanor at trial, and any prior medical opinion on competence to stand trial are

all relevant in determining whether further inquiry is required."        Drope , 420 U.S.

at 180;  see also  Walker v. Gibson  , 228 F.3d at 1227;   Valdez , 219 F.3d at 1240;

Van Woudenberg  , 211 F.3d at 567;   Clayton , 199 F.3d at 1171 (emphasizing that

---

[5]  Because the competency hearing was held before trial, the trial court had
an opportunity to hear the evidence and testimony presented during the
competency hearing as well as to observe the defendant and to hear additional
relevant evidence during trial.  All of this evidence is considered in assessing
petitioner's procedural competency claim under the standard we announce today.

prior medical opinions regarding petitioner's competency are "perhaps most important"); Wallace, 191 F.3d at 1243; Rogers, 173 F.3d at 1290; Walker v. Att'y Gen., 167 F.3d at 1346. "Other relevant factors include evidence of mental illness and any representations of defense counsel about the defendant's incompetence." Walker v. Gibson, 228 F.3d at 1227 (citation omitted); see also Drope, 420 U.S. at 177 n.13 ("Although we do not . . . suggest that courts must accept without question a lawyer's representations concerning the competence of his client . . . an expressed doubt in that regard by one with the closest contact with the defendant . . . is unquestionably a factor which should be considered." (interal quotations and citations omitted)); Barnett, 174 F.3d at 1135–36. "[E]ven one of these factors standing alone may, in some circumstances, be sufficient." Drope, 420 U.S. at 180; see also Pate, 383 U.S. at 384–85 (holding petitioner's rights were violated by the trial court's failure to conduct a hearing on competency despite evidence that petitioner was lucid at trial because of the "uncontradicted testimony of [petitioner's] history of pronounced irrational behavior").

We emphasize that assessment of a procedural competency claim requires us to form a judgment on the aggregate not the segment. We examine the totality of the circumstances: all evidence should be considered together, no single factor "stand[s] alone." Drope, 420 U.S. at 180 (quotation omitted). The question is

not, as we have sometimes stated, whether the trial court "ignored facts," see, e.g., Van Woudenberg, 211 F.3d at 567, but rather whether the trial court "fail[ed] to give proper weight to the information suggesting incompetence which came to light during trial." Drope, 420 U.S. at 179.

## C. McGregor's Competency to Stand Trial

After careful review of the record we conclude that McGregor's procedural due process rights were violated. A reasonable judge should have had a bona fide doubt concerning McGregor's continued competency to stand trial in light of the inconsistent evidence concerning whether McGregor was properly medicated throughout trial, counsel's repeated and vehement contentions that his client was unable to assist in his own defense, McGregor's odd behavior at trial and, of course, McGregor's substantial history of mental illness. Our conclusion is based on the totality of the circumstances, and we do not state an opinion as to petitioner's actual competency to stand trial. Although the state could successfully argue that petitioner was properly medicated or provide a plausible explanation for his seemingly odd behavior at trial, we recognize that hindsight is 20/20 and that our job is to view the record from the standpoint of a reasonable judge at the time of trial who could not, and did not, benefit from such ex post explanations.

1.  Mental Health: Proper Medication

The evidence unquestionably shows that McGregor has a long and tortured history of mental illness. ( <u>See, e.g.</u>, VIII Second Trial Tr. at 246, Testimony of Dr. Brauchitsch ("The records, without exception, gave a very thorough and very serious history of mental illness. As a matter of fact, probably more than one mental illness. But, on one they all seemed to agree, that the patient did seem to suffer from a psychosis, severe type of mental illness in which he suffered from delusions, hallucinations, hearing imaginary voices, feeling that people could read his mind in a delusional way and could influence his actions and the like.").) At trial, Dr. Brauchitsch, a psychiatrist, testified that McGregor's mental illness was likely related to complications during his birth involving oxygen deprivation which resulted in brain damage. McGregor has been diagnosed consistently with schizophrenia, paranoid type, and with anti-social personality disorder.

At a competency trial held in October 1988, McGregor's father testified that he and his wife knew McGregor likely had a disorder by the time McGregor was three. At that young age, McGregor experienced noticeable one- to two-hour periods of disorientation. By seven or eight McGregor began having vivid delusions. McGregor set objects and himself on fire. By fourteen his parents placed him in a mental hospital where he was given shock treatment—described

as an unusually severe and traumatic treatment for a young child—and where he began taking psychotropic medications.

As established at the competency trial, McGregor continues to experience blackout spells and delusional symptoms. At times he hears voices telling him to do things. Many years ago he was shot in the head four times and some bullet fragments remain lodged in his head.

The prosecution presented the testimonies of a psychiatrist and a psychologist at the 1988 competency trial. The psychiatrist, Dr. Lanier, testified McGregor was competent to stand trial prior to his first trial in 1983. Dr. Lanier's testimony was drawn solely from the medical records of another doctor, Dr. Garcia (deceased), whose evaluation of McGregor occurred five years prior to Dr. Lanier's testimony. Dr. Garcia's 1983 medical opinion stated McGregor was paranoid schizophrenic, yet competent to stand trial so long as "he continue[d taking 400 milligrams of Mellaril a day] to retain his present degree of stability." (Id. at 150, 156.) The state's second witness, psychologist Bill Gentry, examined McGregor for forty-five minutes on July 25, 1988, three months prior to the competency trial. Dr. Gentry testified "I felt like on the day that I interviewed him he was competent to stand trial." ( Id. at 179) He further testified that he had no opinion as to McGregor's competence to stand trial on the date of the competency proceeding. His report on McGregor stated "[t]hat schizophrenic

symptoms appear in remission at this time and I feel that is due primarily to the effects of the medication." ( Id. at 187)

The evidence presented at the competency proceeding and at McGregor's second criminal trial was that McGregor was legally competent so long as he remained properly medicated. ( See, e.g. , id. at 150–56, Testimony of Dr. Lanier (finding McGregor competent to stand trial in 1983 if "he continue[d taking 400 milligrams of Mellaril a day] to retain his present degree of stability"); id. at 187, Testimony of Dr. Gentry (stating that "schizophrenic symptoms appear in remission at this time and I feel that is due primarily to the effects of the medication"); VIII Second Trial Tr. at 197, Testimony of Dr. Goodman ( "[W]hen [McGregor] is in a structured, supervised situation and takes his medication . . . he's probably not going to show any psychotic signs.").) Importantly, McGregor's continued proper medication was called into doubt multiple times at trial. On day two of trial, McGregor complained of an extreme headache, and counsel told the court McGregor's dosage of Thorazine had been changed. On the morning of day three, McGregor's counsel again informed the court that McGregor's dosage had been changed and asked to call the penitentiary to find out the proper prescription. In the afternoon, McGregor's counsel asked for, and was granted, an ex parte hearing on McGregor's "sanity." (III Second Trial Tr. at 97.) Two days later, on the morning of the fifth day of trial, the court noted on

- 17 -

the record that the sheriff had told him McGregor refused to take his Thorazine. Later that afternoon, McGregor did take his medicine which he claimed made him drowsy. Accordingly, McGregor remained in his cell so he could sleep and requested that the jailer wake him up at 2:30 p.m. to go back to trial. On day eight, counsel informed the judge that his client was "complaining of some sort of problems medically or mentally." (VIII id. at 6.) Although defendant stayed through the first part of trial, he asked to leave in the afternoon because he did not feel well. The following morning, the court was told that the jail ran out of Thorazine so that defendant received it later than usual.

Although each incident calling into question McGregor's continued medication might be explained such that it is not individually troubling, considered together, all of the incidents call into doubt McGregor's receipt of proper medication throughout his trial. Given the expert testimony that McGregor's competency depended on his proper medication, along with counsel's assessment of McGregor's competency and McGregor's behavior discussed below, the trial judge should have experienced doubt as to petitioner's competency to stand trial.

We consider the trial court's failure to notice changes in McGregor's behavior inconclusive. The test for competency is "whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of

rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." Dusky, 362 U.S. at 402. In finding McGregor's behavior was not different as a result of the alleged change in medications, the court did not find McGregor had been rationally consulting with his attorney as required to demonstrate competency; rather, the court seemed to find only that McGregor had not engaged in any inappropriate outbursts at trial. Several times, the trial judge implied he was unable to assess McGregor's behavior as well as counsel because "I haven't had to be seated next to him throughout the trial." (IX Second Trial Tr. at 125; see also V id. at 131 ("He doesn't seem any different to me today than he's been any other day I've seen him. I can honestly say that. Of course, I don't sit next to him at Counsel table; so I can't answer for that.").)

We also consider unconvincing the state's citation to its own statement in the record, based on hearsay from someone at the penitentiary, that "it would take potentially two weeks of not taking any [psychotropic] medication . . . for it to show up in any behavioral problems of the defendant." (III id. at 13.) The state's argument that there was no material change in petitioner's Thorazine dosage as evidenced by the fact that his counsel, in the ex parte hearing on McGregor's "sanity," focused on the jail's failure to give McGregor Motrin for his headaches

- 19 -

bears weight. [6] However, the explanation for the "changed dosage" does not waylay concerns that should have arisen when the court was informed defendant refused to take his Thorazine [7] and, more importantly, was informed that the jail had insufficient supplies of Thorazine. [8]

The above-mentioned problems with McGregor's medications are exacerbated by the change in the type of psychotropic medications he took. The record establishes that at the time of Dr. Garcia's competency opinion on October

---

[6] Our review of petitioner's medical records establishes that at trial the proper dosage of Thorazine was 50 mg in the morning, 50 mg in the afternoon, and 100 mg at night. We can not conclude from the medication records that petitioner actually received those dosages. The medication records appear to be signed by a prison official every time defendant was administered medicine; however, during trial they are all initialed "OW" (i.e., outwitness), apparently because the medicine was sent to the jail. We do not have medication records from the jail.

[7] The trial court's concern that a criminal defendant should not be able to control a trial simply by refusing to take his medicine is an open question. See Riggins v. Nevada, 504 U.S. 127, 136 (1992) (declining to consider the "question whether a competent criminal defendant may refuse antipsychotic medication if cessation of medication would render him incompetent at trial"). However, we need not answer that question here because we are concerned, in this case, by the sheer number of incidents calling into doubt defendant's continued proper medication. His refusal to take his medication is just one such incident of many, the rest of which were seemingly beyond his control.

[8] The state's inconsistent assertions as to the dosage of Thorazine petitioner was supposed to receive added to the confusion concerning whether petitioner was properly medicated and would have given a reasonable judge even more cause to doubt petitioner's competency to stand trial. (Compare III Second Trial Tr. at 12 (state asserts dosage of Thorazine is 250 mg) with id. at 98 (state says proper dosage is 200 mg).)

- 20 -

17, 1983, before the first trial,[9] McGregor was deemed competent on 400 mg of Mellaril per day. At the time of Dr. Gentry's competency evaluation on July 7, 1988, McGregor was also deemed competent on Mellaril. The record on appeal reveals that McGregor was taking 150 mg of Mellaril at the time of Dr. Gentry's examination but was taking 200 mg at the time of the competency trial.[10] At the time of trial, McGregor was taking 200 mg of Thorazine (i.e., not Mellaril). Frequent switches in the dosages and types of psychotropic medications indicate that McGregor's condition, although controllable, must be monitored and actively maintained. Thus, any alleged variance in his medications should have caused the trial court doubt. We reject the state's argument that the type of psychotropic medication was immaterial to petitioner's competency to stand trial. During the competency hearing, Dr. Lanier, a psychiatrist, testified that although Thorazine and Mellaril are from the same family, Thorazine has different side effects; namely, it is more sedating. ( See, e.g. , Comp. Trial Tr. at 165–66, Testimony of Dr. Lanier ("[Mellaril] is in the same family [as Thorazine], but it has a whole lot

---

[9] Dr. Garcia's report was the basis of Dr. Lanier's testimony at the competency hearing.

[10] Interestingly, until July 4, 1988, three days before his competency evaluation, he had been prescribed only 50 mg of Mellaril a day. After the evaluation, from September 24 to October 4, his Mellaril was again reduced to 50 mg a day. From October 5 to November 16, i.e., several weeks before his competency hearing until several weeks after, his dosage was increased to 200 mg per day. Finally, on November 16 he was switched to Thorazine, 250 mg per day.

of different properties . . . . One, it is not as sedating as Thorazine.").) At trial, the court heard further testimony that the two drugs are different. ( <u>See</u> VIII Second Trial Tr. at 248, Testimony of Dr. Brauchitsch ("[Mellaril is] almost the same [as Thorazine], just has somewhat less side effects.").). The differences between the two drugs could have explained McGregor's alleged drowsiness on the fifth day of trial which caused him to be absent for part of the day. While the judge's concern that McGregor could simply allege drowsiness from his medications and thereby control the trial is appropriate, absent additional expert testimony to the contrary there was sufficient evidence in the record to indicate that McGregor's behavior demonstrated questionable competence. His inability to be present at trial rendered him unable to assist his counsel and thus, in conjunction with the other allegations of error in medicating McGregor, should have caused the trial court doubt as to his competency to stand trial as well.

2. Demeanor at Trial

Accompanying the doubts raised about McGregor's proper medication throughout trial, and thus about his ability to assist in his defense and understand the proceedings, was evidence that McGregor acted in an unusual and inappropriate manner for an individual facing a likely capital sentence. On the first day of trial, McGregor had a temper tantrum because his shirt did not have a pocket and "he thought it looked like a girl's shirt." (I Second Trial Tr. I at 56.)

Apparently, after counsel bought him a shirt with a pocket on it and "some little candy to chew" he calmed down. ( Id. at 56–57.) Fearing McGregor might disrupt voir dire and thereby taint the entire juror pool, the court conducted voir dire of each potential juror individually. At the end of the first day, after the voir dire of a juror who had been a football coach, McGregor stated "Do you want a game of basketball before we leave, one on one?" ( Id. at 227). At the end of the second day of voir dire, McGregor demonstrated potential disorientation. He asked "Where am I going?" and "Y'all going to take me to McAlester?" (II id. at 321.) On day three, McGregor's counsel informed the court that the jail would not let McGregor shave because "they thought he was a risk and should not be allowed to shave." (III id. at 11.) Moreover, counsel told the court that McGregor "had at least one black out this morning." ( Id.) On day five, the morning on which McGregor refused to take his Thorazine, McGregor asked to leave the courtroom and did not come back in the afternoon until the state insisted the sheriff wake him up in his cell. At the beginning of day eight, McGregor's counsel immediately informed the court that McGregor was "complaining of some sort of problems medically or mentally" and that counsel thought McGregor had "been having flashbacks and blackouts already [that] morning." (VIII id. at 6.) That same day he asked to leave because he was not feeling well; he did, however, come back after lunch.

As with the medications, although any one incident may be explained ex post, the sum total of the evidence demonstrates a question as to McGregor's competency at trial. The state argues that McGregor's basketball statement was not surprising when viewed in the context in which it was made, i.e., after the voir dire of a high school coach. Moreover, it argues that McGregor had a known propensity for joking. We find the argument that the statement made sense in the context of the trial unconvincing, particularly in light of the court reporter's note, immediately after McGregor's statement, that "[t]hereupon, there was a brief pause in the proceedings." (I id. at 227.) If the statement were usual, it would not have merited a pause in the proceedings which the reporter felt necessary to record. The dubious evidence concerning McGregor's medication at trial, coupled with McGregor's odd behavior, and his counsel's concerns discussed below, augments our conclusion that a reasonable judge should have had a doubt about McGregor's ability to aid in his defense and to understand the nature of the proceedings.

3. Counsel's Concerns

The final piece of the picture, and perhaps the most important, is Irven Box's—McGregor's trial counsel's—frequent assertions on the record that McGregor was incompetent. "Although we do not . . . suggest that courts must accept without question a lawyer's representations concerning the competence of

his client . . . an expressed doubt in that regard by one with the closest contact with the defendant . . . is unquestionably a factor which should be considered." Drope, 420 U.S. at 178 n.13 (internal quotations and citations omitted). We have stated that although "the concerns of counsel alone are insufficient to establish doubt of a defendant's competency," "[d]efense counsel is often in the best position to determine whether a defendant's competency is questionable." Bryson v. Ward, 187 F.3d 1193, 1201–02 (10th Cir. 1999), cert. denied, 120 S. Ct. 1566 (2000). Unlike other procedural incompetency claims this Court has considered, in this case not only did McGregor have a history of mental illness and act strangely at trial, but his lawyer was adamant throughout trial that McGregor was incompetent. Cf. Walker v. Gibson, 228 F.3d at 1228 (rejecting petitioner's procedural competency claim, in part because trial counsel "explicitly denied raising to the [trial] court that [petitioner] was not competent to stand trial" and "[a]t no time did counsel request a competency evaluation or hearing"); Clayton, 199 F.3d at 1171 (finding no doubt as to petitioner's competency at the time of trial where counsel declined to express "serious" concerns about his client); Walker v. Att'y Gen., 167 F.3d at 1346–47 (rejecting petitioner's procedural incompetency claim, in part because trial counsel never raised the issue of petitioner's competency at trial).

At the competency trial, Box testified McGregor was unable to assist in his own defense in large part because he was unable to focus and he did not understand the nature of the charges against him.[11] Box's opinion was based on his considerable experience with representing criminal defendants—he stated he

---

[11] Box testified as follows at the competency trial:

A. He could not relate to me, at least more than a minute or two, any consistent thought pattern. He would go into a thought about the case and I started immediately asking some background and then asked him about the case and he would start in on some things and then he would be like he became a different person and would change over into a complete, maybe a year or two, different in time-thought patterns and change over into different thoughts or conversation with me. That persisted to the point of, at times I thought that he was even getting out of control. In fact, actually I became fearful a couple of times in that—when I was locked in the room with him.
Q. Did he ever give unresponsive answers to questions that you propounded to him?
A. Several occasions I would ask a question and he would answer something that would have no particular meaning nor understanding to me at all of what the question was. It did not even relate to the question.
. . .
He showed no concern nor interest in [the murder charge and the possible range of punishment for that charge].
. . .
Q. Out of the total time period that you visited with Mr. McGregor on that first occasion, how much of your conversation was worthwhile to you in the preparation of this defense?
A. None of it was worthwhile to help me realistically prepare the defense of the crime itself. All of it was worthwhile in me being able to see what type of a person he was and what I thought he was.

(Comp. Trial Tr. at 104–07.)

- 26 -

represented "[h]undreds per year"—as well as his experience as a police officer, an assistant district attorney, and a judge. (Comp. Trial Tr. at 101.) After explaining McGregor's flare-up about wearing a shirt with no pocket, Box stated, "It's something maybe my five year old son might say. Of course, my theory is he's like a five year old." (I Second Trial Tr. at 56.) On the third day of trial, Box informed the court that McGregor had been "disoriented" the previous day and was unable to assist him. (III id. at 100.) In discussing the possible consequences of McGregor's refusal to take his medication on the fifth day of trial, Box stated, "We do still have to keep in mind that, in my opinion, we're dealing with somebody who is incompetent, who has exhibited incompetent behavior before." (V id. at 10.) Later on that day, Box again made clear that McGregor was not "competent to assist or stand trial." ( Id. at 131.) On day seven, Box stated "I would put in the record that . . . he has not assisted me, he has hindered me from the day this trial started until this very second. He has hindered me in regards to this case and talked nonsense the whole time. I still think he's crazy." (VII id. at 207.) [12] Finally, on the last day of trial, Box

_____

[12] The conversation prior to Box's statement concerned whether or not the court reporter had failed to write down loud statements McGregor made that Box feared the jury could hear. Box made a record of the fact that he thought the defendant had been "continually . . . loud and verbal and has made comments we think that could even be heard by jurors in this particular case." (VII Second Trial Tr. at 205–06.) In response, the court stated that it was obvious McGregor

(continued...)

- 27 -

requested that the jury be removed from the courtroom when he officially rested the case. He informed the court of McGregor's repeated threats to become disruptive once the verdict was read.

> It's not just my feeling, he has adamantly told me that every single day of this trial for nine days. He has told me that visiting with him at the penitentiary, that if the jury does that, what he is going to do. He has actually, himself, written out, verbatim what he is going to say to the jury when that verdict is read. He has told me that. I have no reason to doubt what he is going to do. That statement to me will absolutely kill him, literally and figuratively, kill him when he does.

(IX id. at 126–27.) Finally, Box stated that "I have not ever dealt, in my career, with someone like this person." ( Id. at 124.) Although the court noted defendant had not been disruptive during trial, the court had defendant put in the law library with the door open so he could hear the verdict read but could not make a scene in front of the jury.

The state tries to undermine the significance of Box's assessment of McGregor's competency. In its brief, the state argues that McGregor's competency was demonstrated by his testimony, on his own behalf, at a suppression hearing. Even were we to credit the state's interpretation of that

---

[12](...continued)
was talking to Box but that he and the jury could not hear the contents of their conversations. Counsel for the state similarly stated they could not hear the conversations and, inexplicably, also stated their opinion that McGregor had actually been assisting his lawyer throughout trial.

event, the due process requirement of competency continues throughout trial; one instant of demonstrable competency on McGregor's part does not overshadow the numerous occasions, occurring before and after McGregor's testimony, in which his competency was called into doubt. The state also argues that Box's testimony at the competency trial was "effectively rebutted by the State's witnesses during that hearing and Petitioner was found competent." (Appellee's Supp. Br. at 19.) The "found competent" aspect of the argument is circuitous in that it would have us credit the outcome of an unconstitutional competency trial and, moreover, Box's statements about McGregor's competency to stand trial are examined in the context of the further evidence of incompetency that arose during trial. The state writes off petitioner's threats to disrupt trial because "the record is devoid of even one incident where petitioner was disruptive or engaged in outrageous conduct." (Id. at 19.) But McGregor's continued threats of disruption, although never carried to fruition, must be read as evidence of his inability to assist in his defense. Moreover, the threat to interrupt at the reading of the phase-one verdict demonstrates a failure to understand the nature of the jury's role in determining his fate at phase two of the trial. Finally, we reiterate that the court's failure to notice anything odd about petitioner's behavior is not determinative. The court admitted Box was in a better position to assess petitioner because he was sitting next to him at trial. Moreover, Dr. Brauchitsch's testimony established that it

would not be apparent from limited interactions with McGregor that he was incompetent. Dr. Brauchitsch's testimony supports the proposition that someone who had much opportunity to interact with McGregor, such as his counsel, might be better able to assess his condition than someone who merely observed him from the bench.

> [Box]: Doctor, can someone who has and who is schizophrenic, can they function in society and walk around and say, not be readily observed as say, a nut, a crazy or something of that nature?
>
> [Dr. Brauchitsch]: . . . Many of them can, superficially so, certainly a few would encounter somebody in the street and, you know, he doesn't carry a sign, "I'm a schizophrenic" and unless you ask him very specifically questions like, do you hear imaginary voices or do you think people can read your mind or something like this, which you probably wouldn't do, you know, if you just meet him in the street or just talk to him, you might never find out, you know, what is wrong just by seeing him and talking to him briefly. Unless you know what kind of questions to ask, you wouldn't get the answers that would allow you to realize how sick the patient really is.

(VII Second Trial Tr. at 256.) The state's reliance on the court's failure to notice changes in McGregor's behavior is therefore misplaced. Review of the record shows that although the court had an opportunity to see McGregor, the court very rarely interacted with McGregor verbally. Absent such verbal interaction, we do not find the court's statements that McGregor was not acting any differently from one day to the next probative of McGregor's ability to aid his counsel in his own defense.

## IV. Remedy

Our conclusion that McGregor's procedural due process rights were violated does not end the analysis. We next consider whether a retrospective competency hearing can be held. Our analysis is guided by Supreme Court precedent, Circuit precedent, and the considered decisions of the other Circuit Courts of Appeal. See, e.g., Drope, 420 U.S. at 183; Pate, 383 U.S. at 386–87; Dusky, 362 U.S. at 403; Clayton, 199 F.3d at 1168–70; Reynolds v. Norris, 86 F.3d 796, 802–03 (8th Cir. 1996).

Retrospective competency hearings are generally "disfavored" but are "permissible whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." Clayton, 199 F.3d at 1169 (internal quotation omitted); see also Pate, 383 U.S. at 387 (emphasizing "the difficulty of retrospectively determining an accused's competence to stand trial"). In the context of deciding whether a state court's retrospective determination of a petitioner's competency violated that petitioner's due process rights, we announced factors to be considered in assessing whether a meaningful retrospective determination can be made:

> (1) [T]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with

defendant before and during trial, including the trial judge, counsel for both the government and defendant, and jail officials.

Clayton, 199 F.3d at 1169.

The facts pertinent to our assessment of whether a meaningful retrospective competency determination can be made in McGregor's case are discussed throughout this opinion; thus, we revisit them only briefly now. We are influenced greatly by the lack of contemporaneous medical evidence in the record regarding McGregor's competency at the time of trial. See, e.g., Dusky, 362 U.S. at 403 (concluding no retrospective competency determination could be held "[i]n view of the doubts and ambiguities regarding the legal significance of the psychiatric testimony"); cf. Reynolds v. Norris, 86 F.3d at 803 (holding petitioner's procedural due process rights were violated by the trial court's failure to conduct an additional competency hearing but concluding a sufficient basis existed for the retrospective determination of petitioner's competency because of the "unusual amount of contemporaneous evidence specifically relating to [petitioner's] competency at the time of trial"). As discussed above, only one psychiatrist testified for the state at McGregor's competency hearing. That doctor's testimony was not based on his own experiences with McGregor; rather, it was based solely on then five-year-old notes—now seventeen-year-old notes—of another doctor taken before McGregor's first trial. The psychologist who appeared at McGregor's competency proceeding also presented severely

limited testimony. He refused to opine as to McGregor's competency on the day of the proceeding and limited his assessment to McGregor's competency during a forty-five minute interview that occurred three months prior to the competency proceeding, which itself occurred about seven months before McGregor's second trial. This disturbing lack of contemporaneous medical evidence regarding McGregor's competency at the competency proceeding must be viewed in light of the serious questions raised at trial regarding McGregor's proper medication and the corresponding lack of record evidence available to help answer those questions. Finally, although we emphasize that time is not an insurmountable barrier to a retrospective competency determination, the difficulties arising from the lack of contemporaneous medical evidence are amplified by the further difficulties that necessarily arise from the significant passage of time. A retrospective competency determination would have to place great reliance on the testimony of currently available lay witnesses concerning their recollections of any observations of McGregor more than eleven years ago.

Based on our assessment of the factors set forth in Clayton and the totality of the record before us, we conclude that a meaningful retrospective competency determination can not be made in this case. As such, McGregor's due process rights can not adequately be protected by remanding to the state court for such a determination. We make this determination in the first instance, as did the

Supreme Court in  Drope , 420 U.S. at 183,  Pate , 383 U.S. at 387, and  Dusky , 362 U.S. at 403.  Although we considered remanding to the federal district court to hold a hearing on the issue of whether a meaningful retrospective competency determination can be made, we reject that approach because of the particular balance of circumstances in this case.

## V.  Conclusion

Accordingly, we  **GRANT**  McGregor's request for habeas corpus relief, we **REVERSE**  the judgment of the district court, and we  **REMAND**  with directions to vacate McGregor's sentence and judgment of conviction.  The State of Oklahoma is free to try McGregor again, but only if he is determined competent under a constitutional burden of proof.

No. 99-7038 – MCGREGOR v. GIBSON

**BRORBY**, Circuit Judge, dissenting.  **TACHA**, Chief Judge, and **BALDOCK**, Senior Circuit Judge, joining in the dissent.


I respectfully dissent.


The legal analysis of Mr. McGregor's procedural competency claim as set forth in the majority en banc opinion is essentially the same as that applied by the majority and dissenting panel members in *McGregor v. Gibson*, 219 F.3d 1245 (10th Cir. 2000).  At each stage we asked whether the evidence and circumstances known to the trial court should have raised a bona fide doubt in the mind of a reasonable jurist about Mr. McGregor's ability either to consult with his attorneys with a reasonable degree of rational understanding or to possess a rational and factual understanding of the judicial proceedings.  *See* majority en banc op. at 11-14; *McGregor*, 219 F.3d at 1250-52; *id*. at 1257-58 (Murphy, J. dissenting).  To answer this question we looked at relevant factors such as Mr. McGregor's demeanor at trial, evidence of irrational behavior, prior medical opinions regarding competency, evidence of mental illness, defense counsel's representations and the trial judge's observations.  Majority op. at 12-13; *McGregor*, 219 F.3d at 1251-52; *id*. at 1257-58 (Murphy, J. dissenting).  The issue here, then, is not what law to apply.  Rather, it is how established law applies to the facts of record in this case.

Two of the three panel members, exercising their best judgment, determined Mr. McGregor failed to show a bona fide doubt existed concerning his competency at the time of his second trial. *McGregor*, 219 F.3d at 1252. Now, after exercising their best judgment, six members – a majority – of the en banc court have determined a reasonable jurist would have harbored such a doubt. Majority op. at 31. This numbers game reveals an unfortunate, inherent shortcoming in our capital case habeas corpus jurisprudence. Some death row inmates whose cases present "close calls" garner enough appellate votes to secure federal habeas relief. Some do not.

After carefully reviewing the record, I continue to believe Mr. McGregor has failed to carry his burden of establishing a bona fide doubt in the mind of a reasonable jurist that he was competent to stand trial. The totality of the circumstances and evidence strongly suggest to this reasonable jurist Mr. McGregor deftly toyed with defense counsel and the trial court. Under these circumstances, I believe the observations and reasoned judgment of the trial judge carry significant weight. I would affirm the district court's order denying habeas relief on all grounds.