******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JEFFREY T. CONNOR
(AC 34970)

Bear, Sheldon and Schaller, Js.*

*Argued March 3—officially released September 16, 2014*

(Appeal from Superior Court, judicial district of Hartford, Espinosa, J. [motion to proceed by self-representation; judgment]; Schuman, J. [remand hearing].)

*Mary Boehlert*, assigned counsel, for the appellant (defendant).

*Matthew A. Weiner*, deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anne Mahoney* and *Denise B. Smoker*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

SCHALLER, J. The principal issue in this appeal is whether the trial court, on remand from our Supreme Court, properly determined that the defendant, Jeffrey T. Connor, was competent to represent himself at his criminal trial despite suffering from dementia, psychosis, and residual symptoms from a stroke he had suffered several years before the trial. In April, 2006, following a trial in which the defendant represented himself, a jury found him guilty of several crimes incident to the abduction of his former wife. The trial court, *Espinosa*, *J.*, then rendered a judgment of conviction and sentenced the defendant to a term of thirteen years imprisonment. The defendant appealed from the judgment of conviction directly to our Supreme Court.[1] *State* v. *Connor*, 292 Conn. 483, 973 A.2d 627 (2009). During the pendency of the defendant's appeal, in *Indiana* v. *Edwards*, 554 U.S. 164, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008), the Supreme Court of the United States held that the states are free to adopt a higher standard of competency for defendants who, although competent to stand trial with counsel, may not be competent to conduct trial proceedings without counsel. Our Supreme Court, in its decision, elected to adopt such a higher standard. In addition, the court remanded the case to the trial court, *Espinosa*, *J.*, to determine whether the defendant was competent to represent himself at trial under the higher standard. Judge Espinosa, however, did not conduct the remand proceedings. Rather, another judge, *Schuman*, *J.*, conducted the remand proceedings in her stead. The court, *Schuman*, *J.*, determined that the defendant was competent to represent himself under the higher standard and rendered judgment accordingly. The defendant appeals from the judgment of the trial court on remand. He claims that the court improperly determined that he was competent to represent himself under the higher standard of competency adopted by our Supreme Court in accordance with *Edwards*. We reverse the judgment of the trial court and remand the case with direction to grant the defendant a new trial.

The relevant factual and procedural background is as follows. In 1997, the defendant abducted his former wife.[2] In connection with this abduction, the state charged the defendant with kidnapping in the first degree, robbery in the third degree, robbery involving an occupied motor vehicle, larceny in the third degree, and stalking in the first degree. It was not until 2002, however, that the defendant was arrested on these charges. Prior to his arrest, the defendant had suffered a stroke that confined him to a wheelchair. *State* v. *Connor*, supra, 292 Conn. 490 n.3.

Following his arrest, in pretrial proceedings spanning a period of two and one-half years, the court attempted to ascertain the defendant's competency "both to stand

trial—attempts that were complicated by the defendant's refusal to cooperate with court evaluation teams—and to discharge his court-appointed counsel and to represent himself." Id., 489. These pretrial proceedings concluded with the court finding that the defendant had been malingering and that he, in fact, was competent to stand trial. Id., 499.

Thereafter, in 2006, the defendant's criminal trial commenced with *Espinosa, J.,* presiding. At the outset of the trial, the defendant moved to discharge his appointed counsel and requested permission to represent himself. In the midst of the colloquy[3] that followed, the court stated to the defendant: "[If] you represent yourself, you're not going to walk out of here free, I can tell you that. Because you are not capable, you think you are, you think you know what you're doing, but you're not." The defendant nevertheless insisted that he be permitted to represent himself. The court subsequently granted the defendant's request to represent himself, appointed standby counsel, and the case proceeded to trial.

At the conclusion of the trial, in which "[t]he defendant encountered difficulties in representing himself at various stages" of the trial proceedings; *State* v. *Connor,* supra, 292 Conn. 503; the jury found him guilty of kidnapping in the first degree, robbery in the third degree, robbery involving an occupied motor vehicle, and larceny in the third degree.[4] Id., 504. The court rendered judgment in accordance with the jury's verdict and sentenced the defendant to thirteen years imprisonment. Id., 505.

In the defendant's appeal from his judgment of conviction, our Supreme Court elected "to adopt for mentally ill or mentally incapacitated defendants who wish to represent themselves at trial a competency standard that differs from the standard for determining whether such a defendant is competent to stand trial." Id., 517. In doing so, the court recognized that a mentally ill or mentally incapacitated defendant found competent to stand trial with the assistance of counsel is not necessarily competent to represent himself at that trial. Id., 518. Accordingly, on the basis of *Edwards* and our Supreme Court's supervisory authority over the administration of justice, the court held that "upon a finding that a mentally ill or mentally incapacitated defendant is competent to stand trial and to waive his right to counsel at that trial, the trial court must make another determination, that is, whether the defendant also is competent to conduct the trial proceedings without counsel." Id., 518–19.

Our Supreme Court recognized, however, that "[b]ecause *Edwards* had not been decided prior to the conclusion of the [defendant's trial], Judge Espinosa had no alternative, in light of . . . [then controlling precedent], but to permit the defendant to represent

himself once it was determined that he was competent to stand trial. We therefore do not know whether Judge Espinosa would have granted the defendant's request to represent himself if she had had the authority to deny the request in accordance with *Edwards* and our holding in the present case. Consequently, the case must be remanded for a determination by the court, *Espinosa, J.*, as to whether the defendant then was competent, notwithstanding any mental disability, to conduct the trial proceedings by himself."[5] (Citation omitted; footnote omitted.) Id., 528. Because she presided over the defendant's trial, our Supreme Court emphasized that Judge Espinosa was "best able to make [such a] fine-tuned mental capacity [decision], tailored to the individualized circumstances of a particular defendant . . . ." (Citation omitted; internal quotation marks omitted.) Id., 529. If Judge Espinosa were to determine that she would have denied the defendant's request to represent himself due to his mental illness or incapacity, she was to grant the defendant a new trial; if not, the judgment of conviction was affirmed. Id., 533. On July 14, 2009, the date *Connor* was released, the case was remanded to the court, *Espinosa, J.*, to make such a determination. See id.

Judge Espinosa held two hearings on remand but, for reasons that were not made part of the record, did not complete the remand proceedings.[6] In September, 2011, another judge, *Schuman, J.*, did conduct proceedings pursuant to the remand. Although the record does not reflect the circumstances or reasons for this action, the court, *Schuman, J.*, stated in its memorandum of decision that "Judge Espinosa . . . did not complete work on the remanded issue . . . . [The court] assumed responsibility for the case in September, 2011." The court also stated in its decision that it had "obtained an affidavit from Judge Espinosa concerning her recollection of the proceedings . . . ."[7] The court conducted two hearings pertaining to the remand, the first on February 22, 2012, and the second on May 25, 2012.

In the first hearing held by the court, *Schuman, J.*, on February 22, 2012, the state immediately moved for the court to admit Judge Espinosa's affidavit either as a court exhibit or as a state's exhibit. At that time, however, the defendant was not represented by counsel, was unresponsive to inquiries from the court, and his standby counsel had indicated that "there are some concerns both with respect to the medications [the defendant] is on and . . . further stroke or stroke-like symptoms, which have caused his condition to further deteriorate." The court did not rule at that point on the state's motion to admit the affidavit. Although the affidavit ultimately was marked as a court exhibit, the record does not reveal when that occurred. At the time of the state's motion, however, the court did indicate that "the question here is . . . was [the defendant]

capable of representing himself at the trial? That's the ultimate question, and I think that I can arrive at an answer to that question based on my reading of the transcript, *my consideration of Judge Espinosa's affidavit*, and essentially oral argument from the parties . . . but just . . . *based on the affidavit* and the transcript."[8] (Emphasis altered.)

After the first hearing, the court appointed counsel for the defendant. Following several continuances, the court conducted a second hearing on May 25, 2012, at which both parties conceded that the evidence before the court consisted of the trial transcripts and Judge Espinosa's affidavit. Defense counsel, however, moved to admit the defendant's Department of Correction medical records into evidence. The court admitted the records and indicated that it would consider defense counsel's summary of the records from the period contemporaneous with the defendant's trial, as the records spanned a nearly twenty year period. Defense counsel summarized the contemporaneous medical records as follows: "[B]eginning with a record dated January 18, 2005, [the defendant] is shown as having Axis I mood disorder, dementia relative to [a] cerebral vascular accident . . . a stroke. . . . On January 26, 2005, [a clinical social worker] writes, by history, [the defendant's] Axis I diagnosis is psychosis [not otherwise specified] and dementia due to [stroke]. In February, 2005, a [physician] moved to [involuntarily medicate the defendant], writing [the defendant's] Axis I diagnosis . . . . On February 9, 2005 [a Department of Correction mental health education] . . . hearing panel approves involuntary medication because [the defendant] has been eating his feces and drinking from the toilet. He is deemed gravely disabled. . . . On September 30, 2005, [a physician] moves to [involuntarily medicate the defendant, the] diagnosis being psychotic [not otherwise specified]. . . . [The defendant] refused psychiatric medication from October, 2005, until well into 2008. . . . January, 2006 . . . [the defendant] is nonverbal without eye contact and ineffective coping. . . . January 8 [2006, the defendant is] in [his] cell, lying on bed, self-coat blankets and sheets, noted to have not eaten. [The defendant] refused to talk; vital signs were checked and listed as ineffective coping method."

Following defense counsel's summary of the defendant's medical records, the court heard oral argument "as to the issue, generally, as to whether the record, including any exhibits that have been introduced . . . as part of this remand hearing shows that the defendant was competent to represent himself at trial." The state argued that the defendant carried the burden of demonstrating that he was competent, notwithstanding any mental incapacity, to represent himself. But the state also argued that the defendant needed to establish "that [his] disability impacted his ability to conduct trial proceedings" without counsel—that he was incompetent.

Defense counsel argued that the defendant's trial was "one of the most well attended trials by court staff, including voir dire. I would attribute that, in essence, to the NASCAR[9] effect. It was a spectacle." (Footnote added.) When asked by the court what amount of deference it should give to Judge Espinosa's affidavit, defense counsel replied, "I am under no illusion that you won't give deference . . . as I said, I disagree with it. I disagree with it heartily, but she was the judge and it was returned to her for her opinion."

Thereafter, the court issued its memorandum of decision. In its decision, the court assessed the defendant's competency to represent himself through the evidence adduced during the remand proceedings: (1) the trial transcript, (2) the defendant's medical records, and (3) Judge Espinosa's affidavit.

In assessing the trial transcript, the court summarized the defendant's performance during voir dire, the state's case-in-chief, the defense case-in-chief, and closing arguments. In doing so, however, the court did not make any findings of fact. Rather, it set forth a narrative commentary on the defendant's performance during trial.[10]

With respect to the defendant's extensive medical records, the court stated that "[t]he . . . records [revealed], both before and after the criminal trial, health care professionals diagnosed the defendant with having various psychiatric or psychological diseases or disorders." The court, however, stated that it was "not persuaded" by the medical records. In addition, the court did not make any findings of fact with respect to the medical records. The court stated: "None of the medical examiners [were] present at the defendant's 2006 trial. Further, while medical examiners are commonly in the position of assessing whether a defendant will be competent to stand trial in the future, the issue of whether the defendant has competently represented himself at a trial that has already taken place is different. The issue of competence to stand trial is difficult for a trial judge to assess because the latter cannot fully intrude on the confidential attorney-client relationship and predict whether the defendant will provide effective assistance to his attorney. Therefore, medical experts who can examine the defendant and make professional predictions are particularly helpful. In contrast, the question of whether the defendant has adequately represented himself is primarily a legal issue, not unlike the issue of whether a lawyer has provided the effective assistance of counsel . . . . Because the trial court has either observed the defendant's performance in open court, or at least evaluated it by a review of the transcript, medical experts are not necessary. Therefore, the court does not place any weight on the medical evidence."[11] (Citation omitted.)

Finally, with respect to Judge Espinosa's affidavit,

which did not purport to be a judicial act, that is, an act that represented an attempt, at that point, to carry out the remand, the court recited the statements set forth therein. It emphasized Judge Espinosa's "ultimate conclusion, based on her firsthand observation . . . that the defendant demonstrated that he was sufficiently capable of carrying out the basic tasks needed to present his own defense without the assistance of counsel." (Internal quotation marks omitted.) This "ultimate conclusion" was merely a statement under oath by an affiant. Indeed, when the affidavit was presented and marked, Judge Schuman already had "assumed responsibility" for carrying out the remand. The court, nevertheless, did not make any findings of fact on the basis of Judge Espinosa's affidavit.

The court's analysis of the evidence, having afforded no weight to the medical records, was limited to its assessment of the trial transcript and Judge Espinosa's affidavit. The court stated that it was "troubled by the fact that a reading of the transcript reveals the defendant to have repeatedly attempted to admit evidence that was prejudicial to his own defense, to have presented almost no defense evidence, and to have failed in his closing argument to present the jury with any plausible reason to acquit." This troubling fact, however, was apparently mitigated by the court's opinion that "the most serious charges [did not appear] readily defensible, and it is not clear what a competent attorney would have done differently."

Notwithstanding the court's assessment of the transcript, it gave "considerable deference," in its own words, to Judge Espinosa's "critical finding" that the defendant could perform basic tasks needed to represent himself without counsel. The court stated: "That finding establishes that the defendant's performance has met the ultimate standard that applies in this context . . . . The court must give considerable deference to this finding because Judge Espinosa heard the trial."[12] (Citation omitted.) Thus, the court concluded, "[b]ased largely on Judge Espinosa's firsthand assessment of the defendant's performance," that the defendant was competent to represent himself under *Edwards*. The court rendered judgment to the effect that the defendant was competent to represent himself during trial, Judge Espinosa properly granted his request to do so and, therefore, the defendant was not entitled to a new trial. This appeal followed.[13]

I

The defendant claims that the court improperly determined that he was competent to represent himself under *Edwards*. We agree with the defendant because the court did not conduct a meaningful hearing to evaluate retrospectively the competency of the defendant. Indeed, the indeterminate state of the record precluded the court from retrospectively determining the defen-

dant's competency with the degree of reliability that would have accompanied a competency determination contemporaneous with the defendant's trial. Moreover, because the issue of the defendant's competency was raised by our Supreme Court, was not properly resolved by the court on remand and, for the reasons that follow, cannot, at this point, be resolved by any other judge retrospectively, the court's failure to resolve properly the question of the defendant's competency leaves open the possibility that he represented himself for his entire trial when he was incompetent to do so. The court's error, insofar as it gives rise to such a possibility, may have effectuated a deprivation of the defendant's right to a fair trial. Because the defendant may have been deprived of his right to a fair trial, the court's failure to properly resolve the issue of the defendant's competency is an error of constitutional magnitude which the state, for the same reasons that no other judge can resolve retrospectively the defendant's competency to represent himself at this point, cannot demonstrate was harmless beyond a reasonable doubt. Accordingly, we conclude that the court improperly determined that the defendant was competent to represent himself during his trial and, under these circumstances, the defendant is entitled to a new trial.

A

We begin by setting forth the legal principles governing both the right to self-representation and, as a matter of state law, the level of competency required to exercise that right. "A criminal defendant has a fundamental right to counsel under both the federal and state constitutions. . . . Both the federal constitution and our state constitution [also] afford a criminal defendant the right to [forgo] the assistance of counsel and to choose instead to represent himself or herself at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Connor*, supra, 292 Conn. 506–507.

The right to self-representation, however, is not absolute. "[A] defendant may be competent to stand trial if represented by counsel yet lack the ability to play the significantly expanded role required for self-representation . . . ." (Internal quotation marks omitted.) Id., 525. *Edwards* permits the states to "insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."[14] *Indiana* v. *Edwards*, supra, 554 U.S. 178.

Our Supreme Court, on the basis of *Edwards* and the court's supervisory authority over the administration of justice, adopted a framework whereby a trial court, when "presented with a mentally ill or mentally incapacitated defendant who, having been found competent to stand trial, elects to represent himself . . . must ascertain whether the defendant is, in fact, competent to

conduct the trial proceedings without the assistance of counsel."[15] *State* v. *Connor*, supra, 292 Conn. 527–28.

The competency of a defendant to represent himself is measured by his "ability to carry out the basic tasks needed to present his own defense without the help of counsel . . . notwithstanding any mental incapacity or impairment serious enough to call that ability into question."[16] (Citation omitted; internal quotation marks omitted.) Id., 530. This standard calls for a fact-intensive evaluation of a defendant's capabilities, a task that the trial judge, more particularly the trial judge who has observed the defendant in open court, is best equipped to carry out. See id., 529 (trial judge "best able to make [such a] fine-tuned mental capacity [decision], tailored to the individualized circumstances of a particular defendant" [internal quotation marks omitted]). Under ordinary circumstances, a trial court will determine whether a defendant is competent to represent himself as a matter distinct from that of competency to stand trial. Such a determination, of course, ordinarily will be made at a time substantially contemporaneous with a mentally ill or incapacitated defendant's request for self-representation.

In the present case, however, the trial court, *Espinosa*, *J.*, did not have the benefit of *Edwards*. At the time of the defendant's trial, his competency to represent himself was not understood as an issue distinct from that of his competency to stand trial. Rather, under then controlling precedent, that the defendant was competent to stand trial necessarily implied that he was competent to represent himself. Id., 513 n.19. As a result, the record before our Supreme Court in the defendant's previous appeal did not indicate how Judge Espinosa would have acted with the benefit of *Edwards*. At the same time, however, the record apparently demonstrated to our Supreme Court that the defendant was mentally ill or incapacitated to a point where the trial court, if it had the benefit of *Edwards*, would have had to resolve his competency to represent himself before permitting him to do so. Indeed, our Supreme Court did not remand the case with direction to determine whether it was *necessary* to resolve the defendant's competency to represent himself. Rather, the court sua sponte expressed a doubt as to the defendant's competency and concluded that it was necessary to resolve it, as is evident from its decision to remand the case with direction to determine retrospectively the defendant's competency to represent himself under *Edwards*. Id., 533.

Retrospective competency determinations are more appropriately referred to as nunc pro tunc competency determinations. "Nunc pro tunc, [literally] 'now for then,' refers to a court's inherent power to enter an order having retroactive effect. . . . When a matter is adjudicated nunc pro tunc, it is as if it were done as

of the time that it should have been done." (Citation omitted; emphasis omitted.) *Iouri* v. *Ashcroft*, 464 F.3d 172, 181–82 (2d Cir. 2006), superseded on other grounds, 487 F.3d 76 (2d Cir. 2007), cert. denied sub nom. *Iouri* v. *Mukasey*, 554 U.S. 917, 128 S. Ct. 2986, 171 L. Ed. 2d 885 (2008). Nunc pro tunc competency determinations function as a substitute for contemporaneous competency determinations that should have occurred, but for some reason, did not occur in an underlying proceeding. See id. (nunc pro tunc hearing takes place of contemporaneous hearing as if it had been held at earlier time). Here, the reason that the court, *Espinosa, J.*, did not determine the defendant's competency to represent himself during trial was because, naturally enough, it followed existing law stating that a defendant had an absolute right to represent himself so long as he previously had been found competent to be tried. Although *Edwards* changed that proposition after the fact, our Supreme Court adopted *Edwards* during the pendency of the defendant's direct appeal and, as a result, the rule applied retroactively to his case. See *Marone* v. *Waterbury*, 244 Conn. 1, 10, 707 A.2d 725 (1998) (judgment not limited by its terms to prospective application presumed to apply retroactively to pending cases). Thus, because the court should have but, understandably, failed to determine the defendant's competency to represent himself during trial, the error could only be evaluated for its harmfulness, if at all, through a nunc pro tunc remedy.

Nunc pro tunc competency determinations, however, generally are disfavored. See *Drope* v. *Missouri*, 420 U.S. 162, 183, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975) (noting inherent difficulties of nunc pro tunc competency determinations under most favorable circumstances); *Pate* v. *Robinson*, 383 U.S. 375, 387, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966) (same); *Dusky* v. *United States*, 362 U.S. 402, 403, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (same); *Gold* v. *Warden*, 222 Conn. 312, 317–18, 610 A.2d 1153 (1992) (same); *State* v. *Snook*, 210 Conn. 244, 253, 555 A.2d 390 (same), cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989). This disfavor stems from the danger that a post hoc reconstruction of a defendant's mental state often is unduly speculative and inherently unreliable.[17] *United States* v. *Makris*, 535 F.2d 899, 904 (5th Cir. 1976), cert. denied, 430 U.S. 954, 97 S. Ct. 1598, 51 L. Ed. 2d 803 (1977). For that reason, nunc pro tunc competency determinations are only permissible "whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." (Internal quotation marks omitted.) *McGregor* v. *Gibson*, 248 F.3d 946, 962 (10th Cir. 2001). Accordingly, analyzing the propriety of a nunc pro tunc competency determination involves examining whether such a determination was the product of a meaningful hearing. A hearing is meaningful if and only if a reliable reconstruction of the defendant's

mental state at the time of trial is possible.[18]

In the present case, by way of remanding the matter to the trial court with direction to render a nunc pro tunc competency determination, our Supreme Court implicitly determined that it was permissible for the trial court to render such a determination at that time. The implied permissibility of the nunc pro tunc competency determination, however, was predicated on the assumption that Judge Espinosa would conduct the remand proceedings, as was plainly set forth in our Supreme Court's mandate[19] to the trial court. *State* v. *Connor*, supra, 292 Conn. 525 ("the case must be remanded to the trial court, *Espinosa, J.*"); id., 528 ("the case must be remanded for a determination by the court, *Espinosa, J.*"); id., 529 n.31 ("if the defendant were to persist in refusing to cooperate . . . the trial court would have no choice but to make a determination concerning the defendant's competency to represent himself at the trial that is limited generally to *its recollection of the proceedings* and its review of the trial transcript and arguments of counsel" [emphasis added]).[20]

Judge Espinosa, however, did not conduct the remand proceedings. Instead, another judge "assumed responsibility" for the remand and rendered the judgment that is presently before us.[21] Our Supreme Court's mandate to the trial court did not account for such a contingency and, consequently, in order to resolve the defendant's claim on appeal that the competency determination was improper, we must examine the basis of and grounds of Judge Schuman's determination that the defendant was competent to represent himself at his trial.

B

We must resolve whether the court properly carried out our Supreme Court's mandate and determined the defendant's competency on the basis of the record under the unusual circumstances of this case.[22] Because the propriety of the court's nunc pro tunc competency determination under these unusual circumstances turns on the threshold question of whether the court conducted a meaningful hearing, we focus our analysis on the latter question.

As a general matter, nunc pro tunc competency hearings are meaningful "where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original . . . proceedings." *Reynolds* v. *Norris*, 86 F.3d 796, 802 (8th Cir. 1996). Courts traditionally consider the following factors in determining whether a nunc pro tunc competency hearing was meaningful and, by extension, whether a determination produced from such a hearing was proper: "(1) [T]he passage of time, (2) the availabil-

ity of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with defendant before and during trial, including the trial judge, counsel for both the government and defendant, and jail officials." (Internal quotation marks omitted.) *McGregor* v. *Gibson*, supra, 248 F.3d 962–63; see *United States* v. *Makris*, supra, 535 F.2d 904–905 (delineating similar factors); see also *United States* v. *Giron-Reyes*, 234 F.3d 78, 83 (1st Cir. 2000) (remanding with direction to resolve threshold question of meaningfulness); *United States* v. *Auen*, 846 F.2d 872, 878 (2d Cir. 1988) (same). These factors are not exhaustive and no single factor is determinative. See *Miller* v. *Dugger*, 838 F.2d 1530, 1544 (11th Cir.), cert. denied, 486 U.S. 1061, 108 S. Ct. 2832, 100 L. Ed. 2d 933 (1988); *Johnson* v. *Commonwealth*, 103 S.W.3d 687, 693 (Ky.), cert. denied, 540 U.S. 986, 124 S. Ct. 470, 157 L. Ed. 2d 379 (2003). For our purposes, the primary object of this inquiry is to determine whether the quantity and quality of the evidence would have permitted the court on remand to reliably reconstruct the defendant's competency at the time of trial.

With respect to the first factor, the passage of time, the trial court "assumed responsibility" for the remand in September, 2011. It conducted two hearings in February, 2012, and May, 2012. In June, 2012, the court rendered judgment and issued a memorandum of decision. The defendant's trial occurred in April, 2006. Accordingly, by the time the court conducted hearings and rendered judgment, approximately six years had passed from the date of the defendant's trial.

Turning to the second factor, the availability of contemporaneous medical evidence, the defendant's medical records from the eighteen month period preceding his trial were available and admitted into evidence. These records demonstrated that the defendant had been diagnosed with dementia and psychosis, and was experiencing the residual symptoms of the stroke he had suffered shortly before his arrest. As the court recognized in its decision, the medical professionals who presumably diagnosed and treated the defendant did not testify at trial. Nor were they presented to testify on remand. Moreover, at least several of the entries in the records are illegible.[23] Even where the entries are legible, they are written in medical nomenclature. As a result, it is difficult to discern the legal significance of the legible notations without an expert witness. Although it may have been possible to present the testimony of an expert witness to explain the legal significance of the legible entries, such testimony would have been based on a review of the printed record as opposed to a contemporaneous examination of the defendant. When coupled with the defendant's history of refusing

to engage medical professionals during competency evaluations and the absence of any medical evidence from the precise time of his trial, such expert testimony likely would have begged, rather than resolved, the question of the defendant's competency. See, e.g., *Pate* v. *Robinson*, supra, 383 U.S. 387 (declining to remand for nunc pro tunc competency determination where expert witnesses would have had to testify solely from information in printed record); *Dusky* v. *United States*, supra, 362 U.S. 403 (declining to remand for nunc pro tunc competency determination in light of ambiguities regarding legal significance of psychiatric testimony, but remanding for new hearing to determine petitioner's present competency to stand trial).

Regarding the third factor, the record is replete with statements from the defendant during trial. The defendant's statements during trial, however, are of minimal utility without a proper understanding of his mental state at that time. Insofar as some of the defendant's statements may have indicated that he was competent to represent himself, those statements also may have been the product of his mental illness or incapacity. "Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." *Indiana* v. *Edwards*, supra, 554 U.S. 175. The defendant's mental state during trial, of course, could not have been accurately assessed given the state of the contemporaneous medical evidence that was available to the court.

Finally, we turn to the fourth factor, the availability of individuals who interacted with the defendant during trial. R. Bruce Lorenzen, standby counsel for the defendant during trial, was available during the remand proceedings. The defendant, however, had ceased all interaction with Lorenzen well before the commencement of the 2006 trial. Otherwise, Judge Espinosa provided the court with an affidavit. She did not testify, however, during the remand proceedings. Generally, "[w]e do not encourage the calling of a judge as a witness in subsequent proceedings in a case over which the judge presided. . . . Where there is a compelling need for a judge's testimony as to observed facts in order that justice be done, however, a judge is a competent witness and should not be precluded from testifying." (Citation omitted). *Gold* v. *Warden*, supra, 222 Conn. 320. Judge Espinosa's live testimony would have been necessary insofar as her affidavit set forth what we can characterize only as conclusory statements regarding the defendant's ability to represent himself during trial: "The defendant demonstrated the ability to communicate appropriately and coherently with the court . . . he demonstrated the ability to address the jury in an appropriate and coherent manner . . . the defendant carried out the basic tasks needed to present his own defense in a manner similar to other self-repre-

sented defendants who appeared before me . . . he demonstrated that he was sufficiently capable of carrying out the basic tasks needed to present his own defense without the assistance of counsel." These statements do not constitute "observed facts" and cannot be appropriately labeled as such. Rather, the statements in Judge Espinosa's affidavit collectively constitute an opinion as to the ultimate issue of the defendant's competency, couched in the language of *Edwards*.[24] In addition, Judge Espinosa's affidavit was obtained by the court under circumstances not appearing on the record well before the defendant's medical records were available as evidence, indicating that her statements were made without any knowledge of the defendant's extensive medical records and what they would reveal about his mental state at the time of trial. Although the observations of the trial judge undoubtedly are germane to the issue of the defendant's competency to represent himself, Judge Espinosa's affidavit did not set forth with particularity any observed facts that would assist the court in reconstructing the defendant's competency at the time of trial. Moreover, insofar as her affidavit indicated that she believed the defendant was capable of carrying out the basic tasks needed to present his own defense without counsel, the trial transcript offers a conflicting statement: "[If] you represent yourself, you're not going to walk out of here free, I can tell you that. *Because you are not capable*, you think you are, you think you know what you're doing, but you're not." (Emphasis added.)

In balancing these factors, we are mindful that the passage of time alone does not necessarily render a nunc pro tunc competency determination improper. *McGregor* v. *Gibson*, supra, 946 F.3d 963. The "reliable reconstruction of [a defendant's] mental status [at the time of trial] depends less on time than on the state of the record. Especially where medical information substantially contemporaneous to trial is available, the chances for an accurate assessment increase." (Internal quotation marks omitted.) *State* v. *McRae*, 163 N.C. App. 359, 373, 594 S.E.2d 71 (Timmons-Goodson, J., concurring in the result), appeal dismissed and review denied, 358 N.C. 548, 599 S.E.2d 911 (2004). But where, as here, the record consists of medical records of uncertain legal significance, a pre-*Edwards* trial transcript, some statements from the defendant suggesting he may not have been competent under *Edwards* and others suggesting the contrary, and an affidavit from the trial judge that does not contain any factual observations, but contains opinions that conflict with statements made during trial, the passage of time functions to exacerbate the difficulty of evaluating retrospectively the defendant's competency. In addition, "[t]rial judges . . . try hundreds of different cases involving hundreds of different criminal defendants each year and thousands of cases involving thousands of different criminal defendants

over the course of their term. Therefore, recollecting with certainty the competence of one particular defendant tried several years ago is a monumental task, ripe with inherent difficulties . . . ." Id., 372–73 (Timmons-Goodson, J., concurring in the result). The task borders on the impossible when a judge is asked to reconstruct the mental state of a defendant at a trial that occurred six years earlier, over which the judge did not preside, under a standard that did not yet exist, and pursuant to a remand directed to the trial judge.

Although we recognize that the court, *Schuman, J.*, attempted to carry out the remand once it "assumed responsibility" for the case for reasons not appearing in the record, we conclude that it did not properly determine that the defendant had the competence to present his own defense without the help of counsel. Under these circumstances, the court did not conduct a meaningful hearing and, therefore, its nunc pro tunc competency determination was a "wholly inadequate substitute" for a contemporaneous determination. *Silverstein* v. *Henderson*, 706 F.2d 361, 369 (2d Cir.), cert. denied, 464 U.S. 864, 104 S. Ct. 195, 78 L. Ed. 2d 171 (1983).

## II

This leaves us to determine the appropriate remedy. Although we conclude that the court did not properly determine whether the defendant was competent to represent himself under these circumstances, the issue of the defendant's competency remains unresolved. Our Supreme Court originally raised the issue of the defendant's competency in his previous appeal. In doing so, the court expressed a reasonable doubt as to the defendant's competency, triggering the responsibility of the trial court to resolve his competency under *Edwards*. In light of the unorthodox sequence of events on remand, however, the trial court could not carry out that responsibility. Notwithstanding the court's failure in that regard, it remains clear that the defendant is entitled to a procedurally adequate competency determination. Such a determination, however, is no longer possible. Not only have eight years passed since the defendant's trial, but our analysis in the present case has revealed that any inquiry into the defendant's competency now would be unduly and impermissibly speculative.[25] Thus, insofar as the court's failure to determine whether the defendant was competent to represent himself constituted error, we conclude that such error is no longer amenable to a nunc pro tunc remedy.[26] See *Drope* v. *Missouri*, supra, 420 U.S. 182–83 (concluding nunc pro tunc competency hearing would not adequately protect petitioner's due process rights); see also *Silverstein* v. *Henderson*, supra, 706 F.2d 369 (declining to remand for retrospective competency determination that would be based on conflicting evidence, cold record, and recollection of individuals who interacted with petitioner six

years prior). As a result, it is no longer possible to resolve the reasonable doubt, raised by our Supreme Court, as to the defendant's competency to represent himself during trial.[27]

What remains for our consideration is the court's error in failing to resolve the doubt as to the defendant's *competency*.[28] Because this error cannot be remedied through a nunc pro tunc competency determination, the appropriate relief, if any, turns on an assessment of the error itself. This is so because it is the nature of the error that controls which party would carry the burden under a harmful error analysis.[29] Under these circumstances, the party carrying this burden, in this case, the state, cannot prevail.

The error we must address lies in the court's failure to determine the defendant's competency to represent himself under *Edwards* once a reasonable doubt as to the defendant's competency was raised. This error has left such doubt wholly intact, which, in turn, has left open the " 'real possibility' " that the defendant represented himself for his entire trial when he was incompetent to do so. *State* v. *Jackson*, 283 Conn. 111, 119 n.1, 925 A.2d 1060 (2007). If the defendant, in fact, represented himself when he was incompetent to do so, he was plainly deprived of his constitutional right to a fair trial.[30] "[W]hen a mentally ill or incapacitated defendant is permitted to represent himself at trial despite his . . . lack of competence to do so, the reliability of the adversarial process, and thus the fairness of the trial itself, inevitably is cast in doubt." *State* v. *Connor*, supra, 292 Conn. 527; see *Indiana* v. *Edwards*, supra, 554 U.S. 176–77 (when defendant's lack of capacity to represent himself threatens improper conviction or sentence, self-representation undercuts most basic of constitution's criminal law objectives, providing fair trial). Indeed, the error does not only undermine the fairness of the defendant's trial, but the appearance of fairness upon which the public confidence in our adversarial system relies. See *Indiana* v. *Edwards*, supra, 177 ("proceedings must not only be fair, they must appear fair to all who observe them" [internal quotation marks omitted]). Accordingly, because the doubt as to the defendant's competency to represent himself, once raised, must have been resolved by the court in order to assure the defendant received a fair trial, the court's error in failing to determine the defendant's competency implicates his constitutional right to a fair trial. The error, then, is of constitutional magnitude. See *State* v. *Jenkins*, 271 Conn. 165, 190, 856 A.2d 383 (2004) ("[an error] of constitutional magnitude may be established even though there has not been a complete abridgement or deprivation of the [constitutional] right . . . [and a] constitutional [error] may result . . . when a constitutional right has been impermissibly burdened or impaired by virtue of state action that unnecessarily chills or penalizes the free exercise of the right" [inter-

nal quotation marks omitted]); see also *Gold* v. *Warden*, supra, 222 Conn. 320 (noting court's duty to assure petitioner fair trial).

The state, of course, "bears the burden of proving that [a] constitutional [error] was harmless beyond a reasonable doubt." *State* v. *Brown*, 279 Conn. 493, 511, 903 A.2d 169 (2006). In light of the passage of time and our analysis of the record in the present case, we conclude that the state cannot meet its burden of establishing that the court's error was harmless beyond a reasonable doubt. Accordingly, the defendant is entitled to a new trial.[31]

The judgment is reversed and the case is remanded with direction to grant the defendant a new trial.

In this opinion SHELDON, J., concurred.

[*] The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The defendant appealed from the judgment of conviction directly to our Supreme Court pursuant to General Statutes § 51-199 (b) (3). Our Supreme Court, however, transferred the defendant's appeal to this court in order to consolidate it with another appeal. *State* v. *Connor*, 292 Conn. 483, 487 n.2, 973 A.2d 627 (2009). After this court consolidated the two appeals, our Supreme Court transferred both appeals to itself pursuant to § 51-199 (c) and Practice Book § 65-1. Id.

[2] Our Supreme Court set forth the facts of the underlying criminal case, as the jury reasonably could have found them, in the defendant's previous appeal. See *State* v. *Connor*, supra, 292 Conn. 488–90.

[3] In the lengthy colloquy that followed his request to represent himself, the defendant indicated, among other things, that (1) he had been to school, but did not know where; (2) he did not know where he went to school because he had suffered a stroke and everything that he had learned was from the Bible; (3) he did not remember where he lived or where he was when he had suffered his stroke; (4) he did not have any recollection of the incident giving rise to the criminal charges against him; (5) despite his lack of memory, he was able to represent himself "[b]ecause . . . I can. I will do with the best I can and through the Bible I swear to—I promise to God"; (6) he did not recall what grade in school he had completed, but knew that he was "smart," explaining: "Because I'm reading—on the Bible, there's words in there that are like this long and, like, the guy says, the guy that's reading it, the Bible, he goes to Bible school, too, and he's like, I don't understand that. I said, it's not hard to understand, it's just, you got to read it"; (7) his potential term of imprisonment was "only a number, that's all it is . . . a number"; (8) what would help him to represent himself was "God"; (9) he wanted to remain in his prison garb during trial so the jury would know that he "was in jail for the longest time," as his duration of pretrial confinement was "going to be part of the case, you know"; and (10) he intended on telling the jury "everything," despite the court's suggestion that he would have to confine his questioning of witnesses to relevant issues.

[4] The jury found the defendant not guilty of stalking in the first degree.

[5] At the time of both the defendant's trial and oral argument in his previous appeal to our Supreme Court, a criminal defendant found competent to stand trial was also competent, as a matter of law, to waive the right to counsel for any purpose at that trial, including self-representation. *State* v. *Connor*, supra, 292 Conn. 513 n.19.

[6] On remand, Judge Espinosa did not make any findings of fact or conclusions of law, or otherwise address the issue of the defendant's competency to represent himself during trial. On March 16, 2011, Judge Espinosa was sworn in as a judge of the Appellate Court. See General Statutes § 51-197c (f). On March 6, 2013, she was sworn in as an Associate Justice of our Supreme Court. Because this appeal largely involves matters that occurred before Justice Espinosa's appointment to our Supreme Court, and for clarity, we refer to Justice Espinosa as Judge Espinosa in this opinion.

[7] On January 23, 2012, by way of an affidavit filed at the Hartford Superior Court, Judge Espinosa averred to the following:

"(2) I have personal knowledge of the facts hereinafter set forth.

"(3) In 2006, when I was a Superior Court Judge in the Judicial District

of Hartford, Jeffrey T. Connor appeared before me as a self-represented defendant in a criminal prosecution, *State of Connecticut* v. *Jeffrey T. Connor*, CR 02-0185903.

"(4) I presided over the defendant's trial and observed the manner in which he conducted the trial proceedings.

"(5) The defendant appeared to be engaged in every aspect of the trial proceedings.

"(6) The defendant demonstrated an understanding of the evidence presented by the state and what was occurring during each distinct phase of the trial. Neither the state's theory of the case nor the evidence presented was overly complicated. The evidence against the defendant consisted primarily of the testimony of his former wife.

"(7) At times, the defendant made statements concerning irrelevant matters. It appeared that these statements were a calculated attempt on the part of the defendant to elicit sympathy and, thus, persuade the court or the jury to find in his favor.

"(8) Although, at times, the defendant addressed the court concerning irrelevant matters, during numerous colloquies that transpired during the course of the trial, the defendant demonstrated the ability to communicate appropriately and coherently with the court.

"(9) Although the defendant advanced arguments that ultimately did not persuade the jury to find in his favor, he demonstrated the ability to address the jury in an appropriate and coherent manner.

"(10) At no point during the proceedings did the defendant exhibit the effects of a mental incapacity or impairment such that I questioned whether he possessed the mental ability to conduct the trial proceedings without the assistance of counsel. Had I believed, at any point during the proceedings, that an injustice was being done as a result of the defendant's self-representation, I would have taken appropriate action to protect the defendant's rights, including, but not limited to, ordering the defendant to undergo an evaluation of his mental ability.

"(11) In my experience, the defendant carried out the basic tasks needed to present his own defense in a manner similar to other self-represented defendants who appeared before me.

"(12) Although the defendant did not conduct the trial proceedings with the technical skill or knowledge of an attorney, he demonstrated that he was sufficiently capable of carrying out the basic tasks needed to present his own defense without the assistance of counsel."

[8] Notwithstanding the fact that the defendant was representing himself in a proceeding held for the specific purpose of resolving the precise question of whether he was competent to do so at his trial, the court sought and admitted Judge Espinosa's affidavit into evidence at a point when the defendant was not represented by counsel. Even if we ignore the obvious due process concerns that arise when a defendant represents himself in a proceeding under circumstances calling into question his very competence to do so, as well as the unknown provenance of the affidavit itself, the court did not provide a meaningful opportunity for the defendant or defense counsel, once the latter was appointed, to object to the affidavit or test it through cross-examination, "the greatest legal engine ever invented for the discovery of truth . . . ." (Internal quotation marks omitted.) *O'Shea* v. *Mignone*, 35 Conn. App. 828, 838, 647 A.2d 37, cert. denied, 231 Conn. 938, 651 A.2d 263 (1994). Having never been subject to meaningful adversarial testing, the affidavit was, at best, unsubstantiated and, at worst, unreliable. See *Tyler* v. *Swenson*, 427 F.2d 412, 415 (8th Cir. 1970) ("A member of the judiciary has no peculiar competence in factual recollection of unrecorded events. . . . [T]he many cases a trial judge participates in may well cloud vivid recollection of detail in a specific case. . . . A [defendant] should be permitted to test a judge's recollection, as a witness presenting factual material testimony, as he would any other witness upon cross-examination."); see also footnotes 12 and 26 of this opinion.

[9] "The National Association for Stock Car Auto Racing, Inc., is a corporation engaged in the operation of stock car races." *LeBlanc* v. *New England Raceway, LLC*, 116 Conn. App. 267, 269 n.1, 976 A.2d 750 (2009).

[10] Beginning with voir dire, the court stated that "the defendant's questions to panelists did not seem to further his strategic interests or have any apparent relevance to the case. At times, the questions were attempts at making philosophical statements that jurors simply did not understand."

With respect to the defendant's performance during the state's case-in-chief, the court mentioned that his cross-examination of the complaining witness, his former wife, was "short, but adequate." The defendant's cross-examination of two other state's witnesses, however, was characterized by the court as prejudicial to his case.

The court characterized the defense case-in-chief as commencing with a "long, rambling discussion" from the defendant. The court, however, focused its narrative of the defense case on the defendant's direct examination of his only witness, his brother. It indicated that the defendant continually attempted to elicit testimony from his brother regarding events that occurred years after the crime took place. The court also indicated that the defendant's line of questioning prompted Judge Espinosa to excuse the jury and inform the defendant "of several questions that he could permissibly ask the witness." Thereafter, the court noted the defendant's attempt to admit into evidence a document containing incriminating information, prompting Judge Espinosa to inform him that such information is something he did not want the jury to know. The court also explained how, after the defendant rested his case, the state had to suggest to him that he should move for a judgment of acquittal. The court stated that, although the defendant acquiesced, he "initially bypassed his opportunities to make arguments in support of it."

Finally, with respect to closing arguments, the court characterized the defendant's summation as beginning with a "reasonably appropriate discussion of the evidence." The court noted, however, that he "began to mix his discussion of the evidence with rambling comments about a stroke he had— a matter the court had expressly forbid him from mentioning," a report not made a full exhibit, his history, his incarceration, misstatements of law, and criticism of Judge Espinosa for questioning a witness.

[11] Contrary to the court's position, the issue was not whether the defendant "adequately represented himself" at trial. Rather, the issue was whether the trial court in the underlying criminal case would have permitted the defendant to represent himself if it had had the benefit of *Edwards*. To determine what Judge Espinosa would have done with the benefit of *Edwards* during trial, the court on remand first had to determine the threshold question of whether the defendant was, in fact, competent to represent himself under *Edwards*. Indeed, unless the court was of the opinion that Judge Espinosa would have permitted a defendant incompetent under *Edwards* to represent himself, the question of what she would have done with the benefit of *Edwards* necessarily encompassed consideration of the defendant's competency under *Edwards* and, by extension, any medical evidence that informed that consideration. See *State* v. *Connor*, supra, 292 Conn. 529 (directing court on remand to "consider any and all relevant information, including . . . the extent to which the defendant's competence to represent himself may have been affected by mental illness, by the stroke that he had suffered, and by any memory problems that he may have experienced as a result of that stroke"). Simply put, the court on remand had to consider and analyze the defendant's medical records in order to resolve properly the question posed both by *Edwards* and our Supreme Court's remand. See part I A of this opinion.

Accordingly, we conclude that the court improperly refused to assign any weight to the defendant's medical records. It is of no import that the records were not available at the time of the defendant's trial. As one court has put it: "Post-trial medical evidence to assist in deciding if a defendant was sufficiently competent to represent himself at trial is not significantly different than permitting a medical expert to testify regarding the defendant's sanity at the time of commission of a criminal act. . . . In both circumstances, there is an element of Monday morning quarterbacking. And we are not so much concerned about the unfairness to the trial judge who may be reversed on information that was unavailable to him or her, *but rather whether the defendant received a fair trial.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *McCullah*, Docket No. 12-0081, 2013 WL 530943, *2 (Iowa App. February 13, 2013) (decision without published opinion, 829 N.W.2d 191 [Iowa App. 2013]).

[12] Because the affidavit did not represent a judicial act, the statements therein did not constitute "findings" but were merely statements under oath by an affiant. See *Mireles* v. *Waco*, 502 U.S. 9, 11, 112 S. Ct. 286, 288, 116 L. Ed. 2d 9 (1991) (nonjudicial acts are those acts not taken in judge's judicial capacity).

[13] Our Supreme Court originally retained jurisdiction for "purposes of any appeal from the decision of the trial court either granting or denying the defendant a new trial in the criminal case." *State* v. *Connor*, supra, 292 Conn. 533 n.34. Following oral argument in the present appeal, by order dated March 6, 2014, our Supreme Court ceded jurisdiction to this court. "Insofar as [the Supreme Court] expressed its intent to retain jurisdiction over any appeal taken from the judgment rendered on remand . . . it hereby cedes jurisdiction to the Appellate Court. The Appellate Court rightly heard, and should decide, the defendant's appeal from the judgment rendered on remand." (Citations omitted.)

[14] In effect, *Edwards* permits the states, as a matter of federal law, to place reasonable state law limitations on the exercise of a federal constitutional right. See *State* v. *Connor*, supra, 292 Conn. 518 (noting *Edwards* does not prevent state from permitting mentally ill defendant from representing himself if competent to stand trial; rather, *Edwards* held that sixth and fourteenth amendments to federal constitution do not require state to permit mentally ill defendant to represent himself); see also *State* v. *McNeil*, 405 N.J. Super. 39, 52, 963 A.2d 358 (App. Div.) (same), cert. denied, 199 N.J. 130, 970 A.2d 1047 (1999). "We note that the permissive nature of *Edwards* apparently creates an anomalous situation in which state courts can determine the level of competency necessary for the exercise of federal constitutional rights such that an individual's right to self-representation under the federal constitution may vary from state to state." *State* v. *Connor*, supra, 518 n.22.

[15] We pause to recognize that, although our Supreme Court plainly elected to adopt a higher standard for measuring a mentally ill or incapacitated defendant's competency to represent himself than for measuring such a defendant's competency to stand trial, it did not indicate whether the higher standard functions to bar such a defendant from representing himself at trial. Stated differently, our Supreme Court may have stopped short of holding that a trial judge may never permit a mentally ill or incapacitated defendant found incompetent under the higher standard from representing himself at trial. On the other hand, the court indicated that permitting a defendant to represent himself when he is incompetent to do so may deprive him of a fair trial. See *State* v. *Connor*, supra, 292 Conn. 527 ("when a mentally ill or incapacitated defendant is permitted to represent himself at trial despite his or her lack of competence to do so, the reliability of the adversarial process, and thus the fairness of the trial itself, inevitably is cast in doubt").

[16] Our Supreme Court did not "articulate a precise standard for determining whether a mentally ill or incapacitated defendant . . . found competent to stand trial also is competent to represent himself at trial. For present purposes, it suffices to say that the trial court should consider all pertinent factors in determining whether the defendant has sufficient mental capacity to discharge the essential functions necessary to conduct his own defense, including the defendant's ability to relate to the court or the jury in a coherent manner." *State* v. *Connor*, supra, 292 Conn. 530 n.32.

[17] Although this disfavor has been articulated almost exclusively where nunc pro tunc determinations concern a defendant's competency to stand trial, several decisions have recognized the same disfavor in the context of a defendant's competency to represent himself. See, e.g., *United States* v. *Arenburg*, 605 F.3d 164, 171–72 (2d Cir. 2010) (noting disfavor of nunc pro tunc determination in context of competency for self-representation); *Edwards* v. *State*, 902 N.E.2d 821, 825 (Ind. 2009) (same); *State* v. *Klessig*, 211 Wis. 2d 194, 213, 222, 564 N.W.2d 716 (1997) (same). Indeed, such disfavor is not rooted in the nature of the error giving rise to a potential nunc pro tunc competency inquiry, but the "inherent difficulties" of projecting back and reliably reconstructing a defendant's mental state—that is, the difficulty of the inquiry itself. *Drope* v. *Missouri*, supra, 420 U.S. 183; see *Commonwealth* v. *Santiago*, 579 Pa. 46, 65, 855 A.2d 682 (2004) (explaining United States Supreme Court decisions concerning nunc pro tunc competency inquiries to reflect admonition that retrospectively determining competency is inherently difficult, in some cases insurmountably difficult, but not per se prohibited).

[18] See, e.g., *United States* v. *Arenburg*, 605 F.3d 164, 171–72 (2d Cir. 2010) (remanding for nunc pro tunc competency determination if trial court determines meaningful hearing can be held); *United States* v. *Jones*, 336 F.3d 245, 260 (3d Cir. 2003) (same); *United States* v. *Giron-Reyes*, 234 F.3d 78, 83 (1st Cir. 2000) (same); *United States* v. *Mason*, 52 F.3d 1286, 1293 (4th Cir. 1995) (same); *United States* v. *Auen*, 846 F.2d 872, 878 (2d Cir. 1988) (same); see also *McMurtrey* v. *Ryan*, 539 F.3d 1112, 1131–32 (9th Cir. 2008) (setting forth framework for analyzing meaningfulness of nunc pro tunc competency hearing); *United States* v. *Savage*, 505 F.3d 754, 758 (7th Cir. 2007) (stating validity of nunc pro tunc competency determinations tied to permissibility); *Maynard* v. *Boone*, 468 F.3d 665, 674–75 (10th Cir. 2006) (affirming nunc pro tunc competency determination in part because permissible), cert. denied, 549 U.S. 1285, 127 S. Ct. 1819, 167 L. Ed. 2d 328 (2007); *Watts* v. *Singletary*, 87 F.3d 1282, 1286–87 n.6 (11th Cir. 1996) (remanding for nunc pro tunc competency determination if permissible), cert. denied, 520 U.S. 1267, 117 S. Ct. 2440, 138 L. Ed. 2d 200 (1997); *Reynolds* v. *Norris*, 86

F.3d 796, 802–803 (8th Cir. 1996) (remanding for nunc pro tunc competency determination); *Cremeans* v. *Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) (explaining nunc pro tunc competency determination permissible if based on observations and evidence contemporaneous to trial) (modified on other grounds by *Thompson* v. *Keohane*, 516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383 [1995]), cert. denied, 516 U.S. 1096, 116 S. Ct. 822, 133 L. Ed. 2d 765 (1996); *Wheat* v. *Thigpen*, 793 F.2d 621, 630–32 (5th Cir. 1986) (affirming lower court ruling that nunc pro tunc competency determination permissible), cert. denied, 480 U.S. 930, 107 S. Ct. 1566, 94 L. Ed. 2d 759 (1987).

[19] "A mandate is the official notice of action of the appellate court, directed to the court below, advising that court of the action taken by the appellate court, and directing the lower court to have the appellate court's judgment duly recognized, obeyed, and executed." (Internal quotation marks omitted.) *Hurley* v. *Heart Physicians*, *P.C.*, 298 Conn. 371, 381 n.9, 3 A.3d 892 (2010).

[20] Our Supreme Court further directed the court on remand to "consider *any and all relevant information*, including, but not limited to, the extent to which the defendant's competence to represent himself may have been affected by mental illness, by the stroke that he had suffered, and by any memory problems that he may have experienced as a result of that stroke. The court also should evaluate the extent to which the defendant may have been feigning mental problems. Because of the defendant's refusal to cooperate with the various evaluation teams that had been assembled to assess his competency, it is difficult to discern whether the defendant suffered from a mental illness that, alone or in combination with his stroke, may have rendered him incompetent to represent himself. Accordingly, the trial court may seek to have the defendant examined again if it appears that such an examination would be helpful in resolving the issue presented on remand." (Emphasis added.) *State* v. *Connor*, supra, 292 Conn. 529.

[21] We recognize that our Supreme Court, in addition to a nunc pro tunc competency determination, envisioned a nunc pro tunc exercise of Judge Espinosa's discretion on remand: "We . . . do not know whether Judge Espinosa would have granted the defendant's request to represent himself if she had had the authority to deny the request in accordance with *Edwards* and our holding in the present case." *State* v. *Connor*, supra, 292 Conn. 528. "The . . . case is remanded to the trial court with direction to determine whether it would have denied the defendant's request to represent himself at trial, due to the defendant's mental illness or mental incapacity, even though the defendant was deemed to have been competent to stand trial and to waive the right to counsel. If the court would have denied the defendant's request to represent himself at trial, the . . . court shall grant the defendant a new trial . . . if not, the judgment [of conviction] . . . is affirmed." Id., 533. As discussed previously, however, this exercise of discretion was intrinsically linked to whether the defendant was competent to represent himself under *Edwards*. See footnote 11 of this opinion.

Judge Schuman, under the circumstances of this case, did not make the discretionary determination that our Supreme Court sought from Judge Espinosa. See, e.g., *United States* v. *Garcia*, 413 F.3d 201, 231 (2d Cir. 2005) (Calabresi, J., concurring) (questioning how different human being can say for sure how another would have exercised discretion with correct understanding of law). Because the judges of our Superior Court do not have a collective consciousness, Judge Schuman's conclusion as to what Judge Espinosa would have done in a circumstance that she never contemplated would not have been an exercise of discretion, but a legal fiction. See id., 228 (characterizing as "impossible" attempt of successor judge on remand to determine what original judge would have done with correct understanding of law and fully developed record). Whether a judge in Judge Schuman's position was capable of substituting judicial action for that discretion, however, is an issue that we need not resolve.

[22] Our colleague, who has filed a concurring and dissenting opinion (hereafter concurrence) "question[s]" our "failure to discuss whether the remand instructions could be carried out only by Judge Espinosa or whether another trial judge could perform those instructions." With due respect to the concurrence, the defendant challenges the propriety of the judgment before us on the ground that the court improperly determined that he was competent to represent himself at his criminal trial. Stated differently, the defendant challenges what the court *did*, not *who* did it. Indeed, neither party has ever challenged Judge Schuman's authority to render judgment on remand. Accordingly, the issue of whether Judge Schuman, another judge, or only Judge Espinosa could carry out our Supreme Court's remand is not before us.

[23] On May 25, 2012, during the second remand hearing before Judge Schu-

man, the state continually indicated to the court that the medical records were "handwritten . . . typical doctor writing" and that the prosecutor could not "really read [them]." "[I]t's kind of tough to read the handwriting . . . . They could have brought the doctor in to explain what these notes are."

[24] Notwithstanding the unknown provenance of Judge Espinosa's affidavit, we pause to recognize that the court apparently adopted her affidavit as judicial findings to which it lent "considerable deference . . . ." This was error. Judge Espinosa's affidavit does not contain any indication that it was offered as a substitute for the court's own independent findings of fact and legal analysis. Even if it were, the affidavit apparently was executed well after Judge Schuman "assumed responsibility" for the remand and, therefore, neither its making nor its filing constituted a judicial act. See footnote 12 of this opinion. As the judge who had undertaken compliance with our Supreme Court's mandate by adjudicating a matter in which the predecessor judge had not rendered any findings of fact or conclusions of law, it was Judge Schuman's responsibility to dispose of the case utilizing his own independent judgment. See, e.g., *Stevens* v. *Hartford Accident & Indemnity Co.*, 29 Conn. App. 378, 383, 615 A.2d 507 (1992) (incumbent on successor judge to exercise independent judgment in completing proceedings by way of finding facts and applying law to those facts).

[25] The concurrence states, "[w]ith respect to the nunc pro tunc law invoked by the majority, our Supreme Court did not find in *Connor* that there was any bar grounded in the nunc pro tunc doctrine to its mandate to Judge Espinosa on remand, and that issue was not raised in this appeal. It, therefore, is not properly before us. It is both irrelevant to and moot as an issue in this appeal, and it is unnecessary for this court to address it." We respectfully disagree.

Assuming, arguendo, that the concurrence is questioning our consideration of nunc pro tunc law in connection with the remedy in this case, circumstances have changed substantially so that our Supreme Court's implicit determination with respect to nunc pro tunc law in 2009, three years removed from the defendant's trial and with the assumption that Judge Espinosa would carry out the remand, is no longer applicable. Indeed, we are now eight years removed from the defendant's trial, and our Supreme Court has specifically ceded jurisdiction to this court for purposes of resolving the appeal from the judgment rendered on remand. See footnote 13 of this opinion. As such, it is our independent responsibility to decide this case on the basis of the *present circumstances.* Our duty in this regard is not to interpret our Supreme Court's intent when it issued the original remand order, under different circumstances, five years ago, but to evaluate independently the present circumstances and determine independently, as our Supreme Court did in 2009, whether a reliable nunc pro tunc competency inquiry is feasible, and thus permissible, at this point.

[26] Although the concurrence concludes that Judge Espinosa should be given an opportunity to carry out the remand now, that conclusion is predicated on the notion that she could do so properly and effectively eight years removed from the defendant's trial. Even assuming, arguendo, that Judge Espinosa could, as a practical matter, carry out the remand at this point, we conclude that, as a matter of law, she could not properly do so.

"A judge shall disqualify . . . herself in any proceeding in which the judge's impartiality might reasonably be questioned including, but not limited to, the following circumstances . . . (5) The judge . . . (C) *was a material witness concerning the matter. . . .*" (Emphasis added.) Code of Judicial Conduct, Rule 2.11 (a). The term "material witness" means "[a] person who can give testimony relating to a particular matter no one else, or at least very few, can give." Black's Law Dictionary (6th Ed. 1990).

At the threshold, we note that Judge Espinosa, by virtue of having presided over the defendant's criminal trial, is a "material witness" with respect to the issue of the defendant's competency to represent himself. This fact, however, was not a ground for disqualification when the case was remanded, as rule 2.11 "does not prevent a judge from relying on personal knowledge of historical or procedural facts acquired as a result of presiding over the proceeding itself." Code of Judicial Conduct, Rule 2.11, comment (5). Indeed, as the concurrence states, "[o]ur Supreme Court specifically remanded the matter to Judge Espinosa because she was the judge who had the personal knowledge of what had occurred during the relevant time frame so that she, essentially, could articulate her findings and conclusions under the new standard announced in *Edwards.*" In a judicial role, Judge Espinosa was certainly entitled, if not required, to rely on her own observations as a "material witness" in rendering judgment on remand. After Judge Schuman "assumed responsibility" for the remand, Judge Espinosa was similarly entitled to present those same observations in the role of a witness. See *Gold* v. *Warden*, supra, 222 Conn. 320.

The question, however, is whether Judge Espinosa, as a material witness who *participated* in the remand proceedings by offering material evidence, as noted, an affidavit, can *now* assume the role of judge in this matter? We need not cite the totality of authority that resolves this question in the negative, as "[i]t has long been recognized under similar circumstances that a judge cannot *serve* as a material witness *as well as* the trier of fact." (Emphasis added.) *Tyler* v. *Swenson*, 427 F.2d 412, 415 (8th Cir. 1970). "Indeed, a judge presiding at a trial is not a competent witness, for the duties of a judge and a witness are incompatible." *Lepper* v. *United States*, 233 F. 227, 230 (4th Cir. 1916) (Woods, J., concurring). In the present case, although Judge Espinosa was not presiding on remand, she participated in the proceedings by offering an affidavit containing statements related to her observations of the defendant's self-representation during his trial. Thus, when the court admitted her affidavit as evidence, Judge Espinosa was not merely a "material witness" by virtue of having observed the defendant during his trial, but a "material witness" who *participated* in the remand proceedings *as a witness* offering testimony. See *State* v. *Gardner*, 661 N.W.2d 116, 118 (Iowa 2003) (judge functions as witness even though judge does not actually take witness stand to testify). To be sure, the word "witness," when used as a noun, means "[o]ne who testifies to what he has seen, heard, or otherwise observed. . . . A person whose declaration under oath (or affirmation) is received as evidence for any purpose, *whether such declaration be made . . . by deposition or affidavit*." (Citation omitted; emphasis added.) Black's Law Dictionary, supra. In addition, the word "testimony" means "evidence as is delivered by a witness . . . either orally or *in the form of affidavits* . . . ." (Emphasis added.) Id.

We conclude that it would run "against the grain of fairness"; *Tyler* v. *Swenson*, supra, 427 F.2d 415; to determine that Judge Espinosa, having offered material testimonial evidence as an affiant and, thus, a witness, may now assume a judicial role in this matter. Defense counsel stated to the court that he "heartily" disagreed with the affidavit. The trial transcript contradicts at least some of the statements set forth therein. Further, the court based its decision on the affidavit in rendering judgment on remand. If she were to attempt to carry out the remand in a judicial role now, Judge Espinosa would find herself confronted with the irreconcilable, if not plainly improper task of passing on the credibility and weight of her own disputed and material testimony, as well as sitting in judgment of facts to which she testified.

"Simply stated, if a judge testifies as a material witness with regard to an issue in a case, the remainder of the case must be heard by another judge." *Lewis* v. *State*, 275 Ga. 194, 196, 565 S.E.2d 437 (2002); *State* v. *Gardner*, supra, 661 N.W.2d 118. It is because Judge Espinosa *participated* in the proceeding by offering material and disputed testimonial evidence as a witness, not merely because she was a "material witness" in the literal sense, which leads us to conclude that she cannot assume a judicial role in this matter now or in the future. For that reason, we disagree with the concurrence that Judge Espinosa should be given the opportunity to carry out the remand at this stage. In addition, for the reasons previously set forth in this opinion, as well as the additional passage of time since the defendant's trial, we conclude that no other judge, at this point, could carry out the remand. See part I B of this opinion.

[27] The concurrence "also disagree[s] with the majority's conclusion as a matter of law that Judge Espinosa after eight years cannot remember sufficiently the details of the defendant's performance as a self-represented litigant . . . ." (Citation omitted.) Nowhere do we state such a conclusion. Rather, we assume, without deciding, that even if Judge Espinosa could sufficiently recollect the defendant's criminal trial at this point, she can no longer carry out the remand in a judicial role because she has offered material evidence as a sworn affiant, and thus a witness, in the proceedings. See footnote 26 of this opinion. Insofar as the concurrence concludes that Judge Espinosa was not a material witness because she did not witness any of the defendant's criminal acts, we respectfully disagree. The only issue on remand was whether the defendant was competent to represent himself at his criminal trial. The resolution of this issue turned on an evaluation of the defendant's ability to perform the basic tasks needed to present his own defense without counsel. Judge Espinosa, as the judge who presided at trial, was certainly a material witness to the defendant's ability to present his own defense without counsel. See *Gold* v. *Warden*, supra, 222 Conn. 320 (trial judge could testify at new habeas hearing after remand because of unique opportunity to observe the petitioner's demeanor throughout entire trial).

[28] We respectfully disagree with the concurrence insofar as it summarily concludes that we have "vitiated and invalidated" our Supreme Court's

mandate in this matter. Rather, we conclude as a matter of law that our Supreme Court's mandate can no longer be carried out at this stage.

[29] We pause to distinguish between the error in the present case, the procedural error of failing to determine a defendant's competency to represent himself when a doubt as to competency is raised, and the substantive error of permitting a defendant to represent himself when he is incompetent to do so. In the latter scenario, such a substantive error may constitute structural error. Structural error, of course, is not subject to harmless error analysis. "Cases involving structural error contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . and necessarily render a trial fundamentally unfair . . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . ." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 791, 911 A.2d 1099 (2007).

[30] If the defendant was incompetent to represent himself, and the trial court, on that basis, was bound to deny the defendant's request to do so, it was likewise bound to insist on representation by counsel. See footnote 15 of this opinion. Thus, in addition to affecting the defendant's right to a fair trial, the court's failure to resolve the defendant's competency may have effectuated a deprivation of his right to counsel.

[31] The concurrence states that our opinion, "[o]n the one hand . . . uses the passage of eight years, and its conclusion as a matter of law of a failure of judicial memory because of the passage of those eight years, to determine that a new trial should be granted. On the other hand, at the new trial, assuming that it takes place despite the defendant's possible current (and future) lack of competence to understand the charges and proceedings or assist counsel in his defense, witnesses, primarily the defendant's former spouse, will be required to testify about events taking place almost two decades ago. The logical but unstated extension of the majority's failed memory as a matter of law analysis is that there should be no new trial but instead there should be a reversal of the conviction because no person, including that of the defendant's former spouse, can have sufficient memory after approximately twenty years to be competent as a witness."

We respectfully disagree with the concurrence's "failed memory" argument for two reasons. First, nowhere do we make a conclusion of law regarding "a failure of judicial memory . . . ." See footnotes 26 and 27 of this opinion. Second, even if we did, it is a non sequitur to conclude that just because a judge cannot sufficiently recall the defendant's ability to represent himself in terms of a legal standard not contemplated at the time of the defendant's trial eight years ago, the state's witnesses also will be incompetent to testify in a new trial due to a lack of memory and, therefore, no new trial will occur, notwithstanding the fact that the state's witnesses testified in the defendant's 2006 trial. Indeed, the state's witnesses, including the defendant's former spouse, testified at the 2006 criminal trial and were subject to cross-examination. Thus, if a new trial occurs and a witness cannot testify on account of a lack of memory, the former testimony of that witness likely would be admissible. See Conn. Code Evid. § 8-6 (1) (if declarant unavailable as witness, former testimony not excluded as hearsay if [a] issues in former hearing are same or substantially similar to those in hearing in which testimony now being offered and [b] party against whom testimony now offered had opportunity to develop testimony in former hearing); see also *State* v. *Frye*, 182 Conn. 476, 481, 438 A.2d 735 (1980) ("declarant witness may be considered unavailable . . . [if] the witness has a lack of memory").